766 P.2d 678

STATE of Idaho, Plaintiff–Respondent,

v.

Albert Ray BEAM,
Defendant–Appellant.

Albert Ray BEAM, Petitioner–Appellant,

v.

STATE of Idaho, Respondent.

Nos. 16542, 16543.

Supreme Court of Idaho.

June 16, 1988.

Dissent on Denial of Rehearing
Dec. 30, 1988.

Van G. Bishop, Canyon County Public Defender, Nampa (argued), for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise (argued), for plaintiff-respondent.

BAKES, Justice.

The appellant, Albert Ray Beam, was convicted of murder and rape and sentenced to death. The conviction and sentence were affirmed by this Court on direct appeal in *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985), *cert. denied* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). The complete factual background leading to Beam's murder conviction and sentence is set out in *State v. Beam, supra.* In sum, Beam and his co-defendant, Scroggins, were convicted of the first degree murder of a thirteen year old girl. Beam was also convicted of raping the girl. The co-defendant, Scroggins, was additionally convicted of attempted rape. Both men were sentenced to death. On direct appeal, Scroggins' death sentence was vacated because it was found to be disproportionate, primarily because of his youth and lack of any significant prior criminal record. *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1986). However, this Court affirmed Beam's conviction and death sentence on direct appeal. Thereafter, Beam filed a petition for post conviction relief and an I.C.R. 35 motion to reduce his sentence. Additionally, Beam moved to disqualify the original trial judge from sitting in the post conviction and sentence reduction proceedings.

Beam's motion to disqualify alleged that the trial judge was biased and prejudiced because he had disqualified himself from Scroggins' resentencing, and in the order of disqualification made several statements which indicated that the judge disagreed with the Idaho Supreme Court's reduction of Scroggins' sentence and believed that both Beam and his co-defendant, Scroggins, should have received the death penalty for the heinous murder which they had committed. Beam contended that because of this self-disqualification in the Scroggins resentencing the trial judge could not objectively consider his post conviction relief petition or the I.C.R. 35 request for reduction of sentence. The trial court summarily denied the motion to disqualify. Beam then filed a second motion, this time specifically filing it pursuant to Idaho Criminal Rule 25(b). The second motion further alleged that the trial judge had a predisposed bias with regard to the issue of proportionality. A hearing was conducted on this motion. After the hearing, Beam's motion was denied.

In his post conviction relief petition, Beam alleged that (1) the dual jury procedure used by the trial court deprived him of

his constitutional rights; (2) the sentence imposed on him was excessive, unduly harsh and disproportionate to the sentence to be served by his co-defendant, Shawn Scroggins; (3) Idaho's statutory capital sentencing procedure violated his right to jury sentencing rather than court sentencing; and (4) I.C. § 19–2719 (which shortened the time in which to bring his post conviction relief petition) deprived him of equal protection of the law. In denying the post conviction relief petition, the trial court refused to relitigate issues settled in the prior appeal and found that I.C. § 19–2719 had a rational and legitimate government basis and therefore did not deny equal protection of the law and was constitutional.

Beam's I.C.R. 35 motion to correct or reduce the sentence stated as grounds that, because the Idaho Supreme Court had found that the trial court had erroneously sentenced Beam's co-defendant Scroggins to death, Beam's sentence was inherently disproportionate. In denying the Rule 35 motion, the trial court ruled that Beam had failed to carry the burden of (1) proving error, or (2) demonstrating the existence of facts or legal issues which were not considered at trial and which might affect the previously imposed sentence.

## I

### The Post Conviction Relief Proceeding

On appeal Beam argues that the trial court erred in denying each of his four grounds for post conviction relief. The trial court found three of Beam's grounds barred by the doctrine of *res judicata* and ruled on the fourth ground, that I.C. § 19–2719 was constitutional. In resolving Beam's challenge to the trial court's disposition of his petition for post conviction relief, we must first examine the issues raised in the petition to determine which were properly before the trial court and which were precluded from consideration because of the *res judicata* effect of this Court's decision in Beam's direct appeal. *State v. Beam, supra.*

First we note that the Idaho legislature has adopted the Uniform Post–Conviction Procedure Act which is found in Title 19, chapter 49, of the Idaho Code. All post conviction relief actions must be brought pursuant to the statutory grounds set forth in I.C. § 19–4901. The Uniform Post–Conviction Procedure Act is designed to avoid repetitious and successive applications for appellate action and to eliminate confusion while still protecting the applicant's constitutional rights. *Dionne v. State,* 93 Idaho 235, 459 P.2d 1017 (1969). An application for post conviction relief is a special proceeding, civil in nature, and is an entirely new proceeding, distinct from the criminal action which led to the conviction. *Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986); *State v. Bearshield,* 104 Idaho 676, 662 P.2d 548 (1983). The statute specifically provides that "[a]ny issue which could have been raised on direct appeal, but was not, is forfeited and may not be considered in post conviction proceedings, unless it appears to the court, on the basis of a substantial factual showing by affidavit, deposition or otherwise, that the asserted basis for relief raises a substantial doubt about the reliability of the finding of guilt and could not, in the exercise of due diligence, have been presented earlier." I.C. § 19–4901(b). *See also Palmer v. Dermitt,* 102 Idaho 591, 635 P.2d 955 (1981); *Kraft v. State,* 100 Idaho 671, 674, 603 P.2d 1005, 1008 (1979); *Hernandez v. State,* 100 Idaho 581, 602 P.2d 539 (1979); *Potter v. State,* 114 Idaho 612, 759 P.2d 903 (Ct.App.1988).

Beam's post conviction relief petition did not raise factual material "not previously presented and heard" under I.C. § 19–4901(a)(4). Rather, it raised only legal issues under I.C. § 19–4901(a)(1). A review of our decision in Beam's direct appeal demonstrates that Beam had previously litigated three of the four legal grounds that he asserts in seeking post conviction relief. In *State v. Beam, supra,* we upheld (1) the constitutionality of the dual jury procedure used in Beam's trial, (2) the constitutionality of Idaho's capital sentencing procedures, and (3) the proportionality and legality of Beam's death sentence. Thus, the trial court correctly refused to relitigate those issues because

they had previously been decided on direct appeal and thus were *res judicata.* *Kraft v. State, supra; Potter v. State, supra.* That leaves only Beam's final ground for post conviction relief, *i.e.,* the constitutionality of I.C. § 19–2719, which is purely a legal issue which we now address.

## II

### *Constitutionality of I.C. 19–2719*

Beam argues that I.C. § 19–2719 is an unconstitutional violation of his equal protection rights. The filing requirements under general provisions of the Uniform Post–Conviction Procedure Act provide that "[a]n application may be filed at any time within five (5) years from the expiration of the time for appeal or from the determination of an appeal or from the determination of a proceeding following an appeal, whichever is later." I.C. § 19–4902. However, the legislature has adopted special appellate and post conviction procedure rules for capital cases in I.C. § 19–2719. The basis for Beam's claim that I.C. § 19–2719 is unconstitutional is I.C. § 19–2719's filing requirement which mandates that "[w]ithin forty-two (42) days of the filing of the judgment imposing the punishment of death, and before the death warrant is filed, the defendant must file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known." Beam argues that this requirement violates his constitutional right to equal protection because it creates a suspect class, and that the statute does not meet a compelling state interest because there is no justification for requiring those sentenced to death to bring their post conviction relief petitions within 42 days when all other criminal defendants are allowed up to five years to bring their petitions.

A constitutional equal protection analysis first requires the identification of (1) the classification which is being challenged and (2) the standard under which the classification will be judicially reviewed. *Davis v. Moran,* 112 Idaho 703, 735 P.2d 1014 (1987); *Tarbox v. Tax Comm'n,* 107 Idaho 957, 695 P.2d 342 (1984). Secondly, it must

be determined whether the appropriate equal protection standard has been satisfied. *State v. Breed,* 111 Idaho 497, 725 P.2d 202 (Ct.App.1986).

There is no authority to support Beam's argument that I.C. § 19–2719's special procedure for capital cases involves a suspect class for equal protection analysis purposes. Suspect classes are those classes which have historically been encumbered with disabilities or have been subjected to unequal treatment or have been excluded from the majoritarian political process. *See Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976); *San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Suspect classes which have deserved special scrutiny have been based on race or national origin, religion, alienage, sex, non-residency and wealth. *See* 16A Am.Jur.2d *Constitutional Law* § 750 (1979). It is clear that I.C. § 19–2719, which provides special expedited procedures for post conviction review in capital cases, does not involve a suspect class within the meaning of the United States Constitution or the Idaho Constitution, and accordingly strict scrutiny is not required. *Davis v. Moran, supra; Tarbox v. Tax Comm'n, supra; Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976).

Accordingly, where there is no suspect class, the legislature's enactment of I.C. § 19–2719 need only have a rational basis, unless it can be said that I.C. § 19–2719's special procedures for expediting post conviction proceedings in capital cases constitutes an "obviously" "invidiously discriminatory classification," in which event the means-focus test of *Jones v. State Bd. of Medicine, supra,* is the appropriate standard. *Jones v. State Bd. of Medicine,* 97 Idaho at 867, 555 P.2d 399. Under the means-focus test, if the statute establishes an "obviously" "invidiously discriminatory classification," the "Court will examine the means by which those classifications are utilized and implemented in light of the asserted legislative purpose" to determine

if "the legislative means substantially furthers some specifically identifiable legislative end." *Id.* The means-focus equal protection analysis requires a determination of whether different treatment is accorded to persons "on the basis of criteria wholly unrelated to the objective of the statute." *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971).

■ We find no "obviously" "invidiously discriminatory classification" in I.C. § 19–2719, as described in *Jones.* Not every legislative classification which treats different classes of people differently can be said to be "discriminatory," much less "obviously" "invidiously discriminatory." Otherwise, all legislative classifications would require a means-focus analysis, and the rational basis test, which is the primary basis upon which most equal protection evaluations are made, would be eclipsed. For a classification to be "obviously" "invidiously discriminatory," it must distinguish between individuals or groups either odiously or on some other basis calculated to excite animosity or ill will.[1] I.C. § 19–2719 and its special procedures were specifically enacted to "accomplish the purpose of eliminating unnecessary delay in carrying out a valid death sentence." I.C. § 19–2719. Nothing therein could be described as obviously invidiously discriminatory. Accordingly, we find the means-focus classification to be inapplicable to I.C. § 19–2719.

However, even if the means-focus analysis were applicable to I.C. § 19–2719, the means-focus standard would only be violated if persons were placed "into different classes on the basis of criteria wholly unrelated to the objective of the statute."

*Reed v. Reed, supra,* 92 S.Ct. at 254. On appeal, "this Court will examine the means by which those classifications are utilized and implemented in light *of the asserted legislative purpose.*" *Jones v. State Board of Medicine, supra,* 97 Idaho at 867, 555 P.2d 399 (emphasis added). I.C. § 19–2719 specifically states that its special procedures are for the express purpose of "eliminating unnecessary delay in carrying out a valid death sentence." Unlike a sentence of imprisonment, which can be carried out during the pendency of a post conviction proceeding, the sentence of death cannot be carried out without rendering any post conviction relief proceeding moot. Accordingly, unless a judgment and sentence in a capital case is stayed pending post conviction proceedings, those post conviction proceedings would be rendered moot by carrying out the sentence of death. If a capital defendant had five years within which to file a post conviction proceeding, and if during that five-year period the judgment and sentence of death were stayed waiting for the filing of post conviction proceedings, an automatic delay of five years would occur in addition to the exceedingly long time now required to process the appeal from the judgment and sentence and the federal *habeas corpus* proceedings. Death penalty cases, which often take more than ten years to conclude, could be delayed an additional five years by a capital defendant skillfully manipulating a five-year filing period for post conviction proceedings. The 42–day requirement in I.C. § 19–2719 was enacted to eliminate those five years of additional delay and is clearly "[r]elated to the objective of the statute," as expressed in the statement of purpose of the act.[2] *Reed v. Reed, supra,* 92 S.Ct. at

---

1. Dictionary definitions of "invidious" include the following:
"[D]etrimental to reputation: defamatory ...: likely to cause discontent or animosity or envy ...: full of envious resentment: jealous ...: of an unpleasant or objectionable nature: hateful, obnoxious ...: causing harm or resentment: injurious...." Webster's Third New International Dictionary, p. 1190 (1971).
"[S]uch as to bring odium, unpopularity, or envious dislike: ... calculated to excite ill will or resentment or give offense...." American College Dictionary, Text ed., p. 642.

2. "STATEMENT OF PURPOSE
RS 10317
"It has been the experience of other state judicial systems that prisoners sentenced to death often attempt to thwart their sentences by drawing out post-conviction review for as long as possible. Accordingly, it is not uncommon to find capital prisoners filing numerous separate claims for post-conviction and habeas corpus relief, hoping to spend several years appealing each such claim separately.
"This statute seeks to avoid such abuses of legal process by requiring that all collateral claims

254. Accordingly, I.C. § 19–2719 would meet even the means-focus analysis, if that standard were applicable. However, as indicated above, the classification drawn by I.C. § 19–2719 is not "obviously" "invidiously discriminatory," and thus the rational basis test, rather than the means-focus test, is applicable.

▆ Under the rational basis test, which is the appropriate test here, the legislature's action need only have a rational relationship to a legitimate governmental purpose. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), *reh'g denied*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981); *McGinnis v. Royster*, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *Leliefeld v. Johnson*, 104 Idaho 357, 374, 659 P.2d 111, 128 (1983) ("Under the 'rational basis' test which is generally appropriate to use when reviewing statutes which impact social or economic areas, the question becomes whether the classification 'advances legitimate legislative goals in a rational fashion.'" [quoting from *Schweiker v. Wilson*, 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981)]). The validity of I.C. § 19–2719 must be tested on that standard. In applying the rational basis test, we begin with the understanding that (1) the legislature may reasonably exercise its power to define crime and fix punishment by classifying criminals with reference to the heinous nature or gravity of the crime committed, *see Malloroy v. State*, 91 Idaho 914, 435 P.2d 254 (1967), and (2) legislative declarations of public purpose are afforded great deference in determining the validity of legislation under the equal protection clauses of the United States and Idaho Constitutions. *See Idaho Water Resource Board v. Kramer*, 97 Idaho 535, 548 P.2d 35 (1976).

In this case the legislature clearly pointed out a rational basis for I.C. § 19–2719 in the statement of purpose which accompanied the enactment of the statute. The underlying legislative purpose behind the statute stated the need to expeditiously conclude criminal proceedings and recognized the use of dilatory tactics by those sentenced to death to "thwart their sentences." The statute's purpose is to "avoid such abuses of legal process by requiring that all collateral claims for relief ... be consolidated in one proceeding...." We hold that the legislature's determination that it was necessary to reduce the interminable delay in capital cases is a rational basis for the imposition of the 42–day time limit set for I.C. § 19–2719. The legislature has identified the problem and attempted to remedy it with a statutory scheme that is rationally related to the legitimate legislative purpose of expediting constitutionally imposed sentences. Accordingly, I.C. § 19–2719 does not violate the defendant's constitutional right to equal protection, and the trial court correctly denied Beam's post conviction petition.

### III

### *The Motions for Disqualification*

Beam argues on appeal that the trial judge should have disqualified himself from presiding over both the post conviction proceeding and the I.C.R. 35 motion hearing for reduction of sentence. During the course of the proceedings below, Beam made two motions for disqualification which alleged basically the same grounds. Both motions were made under I.C.R. 25, with the second motion specifically referring to subsection (b) of Rule 25. Initially it is necessary to point out there is no right to an automatic disqualification of the trial

for relief that are known or that reasonably should be known be consolidated in one proceeding to be conducted prior to appeal or automatic review. It is the goal of this procedure to limit, as far as possible, post-conviction appellate review of death sentences to a single appeal in which all bona fide issues are to be raised. "The statute also provides procedures for dealing with stays of execution in order to provide

clearer guidelines to state courts confronted with demands for stay of execution.
"Under this statute, capital cases are to receive first priority in the courts for the purpose of further reducing delays in resolving capital cases." Statement of Purpose accompanying S.B. No. 1345, approved April 2, 1984 (on file at Idaho State Law Library).

judge in either a post conviction proceeding or an I.C.R. 35 motion for reduction of sentence.[3] Thus, the only basis for disqualification of the trial judge in a post conviction proceeding is for cause under I.C.R. 25(b), which reads as follows:

"**Rule 25.  Disqualification of judge.—**

. . . .

"(b) Disqualification for cause.  Any party to an action may disqualify a judge or magistrate from presiding in any action upon any of the following grounds:

"(1) That he is a party, or is interested, in the action or proceeding.

"(2) That he is related to either party by consanguinity or affinity within the third degree, computed according to the rules of law.

"(3) That he has been attorney or counsel for any party in the action or proceeding.

"(4) That he is biased or prejudiced for or against any party or his case in the action."

Beam's claim that the trial judge was biased or prejudiced against him rests on the grounds set out in I.C.R. 25(b)(4).  Beam's motion stated that, after this Court had vacated his co-defendant's death sentence (thus eliminating the possibility of the death sentence), the trial judge disqualified himself from further participation in the co-defendant's sentencing, stating that he could not "in good conscience impose or sign a judgment upon remand [of Scroggins] that is not its [the court's] own and

with which it disagrees."  Beam argues that this statement, along with other statements in the order of disqualification, indicates that the trial judge sharply disagreed with this Court's action in vacating Scroggins' death penalty and ordering resentencing to a lesser sentence.  From this factual stance, Beam argues that the judge was biased and prejudiced against him and therefore should not have presided at either the post conviction or the I.C.R. 35 review proceedings.  We disagree with Beam's contention for the following reasons.

As pointed out in Part I, of the four issues raised in the post conviction relief proceeding, the district court was precluded from considering the first three.  This results from the *res judicata* effect of this Court's prior decision in Beam's direct appeal.  *Beam v. State*, 109 Idaho 616, 710 P.2d 526 (1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986).  The fourth issue raised in the post conviction proceeding, regarding the constitutionality of I.C. § 19–2719, is a pure question of law and, as discussed in Part II of this opinion, the trial court's decision was legally correct.  Accordingly, there is no legal merit to any of the claims raised by appellant in the post conviction proceeding, and the issue of trial court prejudice in the post conviction proceeding is essentially moot.

Secondly, Beam's allegation that the trial judge's self-imposed disqualification in the *Scroggins* case demonstrated a predisposition toward his post conviction petition and I.C.R. 35 sentence reduction motion does

---

**3.**  Peremptory or automatic disqualification of a judge is governed by either I.C.R. 25 or I.R.C.P. 40(d)(1).  Both of those rules, as they existed when this action was instituted, specifically provide that:

"The right to one (1) automatic disqualification under this rule shall not apply to a post conviction proceeding under chapter 49 of title 19, Idaho Code, when that proceeding has been assigned to the judge who entered the *judgment and sentence being challenged by that proceeding. . . .*"

In 1987 these rules were redrafted.  However, both I.C.R. 25(a)(9)(ii) and I.R.C.P. 40(d)(1)(I)(ii) still clearly point out that post conviction proceedings are an exception to an applicant's right to automatic disqualification.  The present I.R.C.P. 40(d)(1)(I)(ii) reads:

"(I) Exceptions.  Notwithstanding the above provisions, the right to disqualification without cause shall not apply to:

. . . .

"(ii) A judge or magistrate in a post-conviction proceeding, when that proceeding has been assigned to the judge or magistrate who entered the judgment of conviction or sentence being challenged by the post-conviction proceeding."

I.C.R. 25(a)(9)(ii), I.C.R. 35 and Federal Criminal Rule 35 are all identical.  Federal case law clearly indicates that, under Rule 35, motions to correct or reduce a sentence are to be heard by the court that rendered the original judgment and sentence.  *See* Wright, *Federal Practice & Procedure: Criminal* (Second) § 582 (1982).

not demonstrate any legally recognizable bias. In order to constitute legal bias or prejudice, allegations of prejudice in post conviction and sentence reduction proceedings must state facts that do more than "simply explain the course of events involved in a criminal trial." *State v. Lankford*, 113 Idaho 688, 701, 747 P.2d 710, 723 (1987).

Every trial judge who rules upon a post conviction review proceeding or an I.C.R. 35 motion to reduce sentence will previously have pre-judged the matter, often forming extremely strong opinions as to the sentence which should be imposed, and will no doubt be convinced that the procedure followed and the sentence imposed was correct, particularly where the trial court proceedings have been affirmed on appeal by this Court. It would be an unusual case in which a trial judge, when called upon to rule on an I.C.R. 35 motion to reduce sentence, would not approach the case on the basis that the sentence imposed was correct, and require the defendant to shoulder "the burden of showing that the original sentence was unduly severe." *State v. Martinez*, 113 Idaho 535, 536, 746 P.2d 994, 995 (1987). Coming to the case with that frame of mind does not constitute bias or prejudice within the meaning of I.C.R. 25(b)(4) and does not require disqualification of the trial judge. In this case the judge in question had presided at the trial of both Beam and Scroggins. He had heard all of the evidence regarding this brutal murder and raping of an innocent thirteen year old girl. He had presided at the sentencing proceedings in which extensive mitigation and aggravation evidence was presented to the court. Based upon all of that evidence, the trial court then arrived at the judgment that the aggravating circumstances outweighed the mitigating circumstances and sentenced both defendants to death. The death penalty is reserved for only the most heinous of first degree murders. The very nature of the sentencing process in capital cases requires a trial judge to form strong opinions and convictions that the defendant merits the most severe penalty. It would be extremely unlikely and no doubt improper for a trial court to impose a death penalty unless it had formed the strong opinion and belief that the defendant had no redeeming features, and that the circumstances of the particular case justified the imposition of this most serious penalty known to the law. Accordingly, when a trial judge is called upon to rule upon a petition for post conviction relief, or a motion for reduction of sentence under I.C.R. 35, particularly in a case where the death penalty has been imposed, he comes to the case after having already formed strong opinions and beliefs regarding the atrocious nature of the crime, the unredeemable character of the defendant, and the need of society to impose this most serious of criminal penalties. A trial judge is not required to erase from his mind all that has gone before, and indeed, it is doubtful that any human being could. Rather, when faced with an I.C.R. .25(b)(4) motion to disqualify for bias and prejudice in a post conviction or I.C.R. 35 proceeding, the trial judge need only conclude that he can properly perform the legal analysis which the law requires of him, recognizing that he has already pre-judged the case and has formed strong and lasting opinions regarding the worth of the defendant and the sentence that ought to be imposed to punish the defendant and protect society.

We conclude that the trial court did not err in refusing to disqualify himself from participating in the post conviction and I.C.R. 35 sentence reduction proceedings in this case merely because he had disqualified himself from further participation in the resentencing of appellant Beam's co-defendant Scroggins, even though, in the process, he had expressed strong disagreement with this Court's action in *State v. Scroggins, supra*, which vacated Scroggins' death penalty sentence.

IV

Finally, we address Beam's argument that the trial court erred in refusing to reduce his sentence pursuant to his I.C.R. 35 motion. Rule 35 is designed to allow a trial court to either (a) correct an illegal

sentence, or (b) correct a sentence imposed in an illegal manner. It authorizes the court to reduce a lawful sentence if, on further reflection, the court believes that it has been unduly harsh. *See also* Wright, Federal Practice & Procedure: Criminal 2d § 581 (1982).

"An I.C.R. 35 motion to reduce sentence is essentially a plea for leniency, and a decision thereon is vested in the sound discretion of the *sentencing court, State v. Arambula,* 97 Idaho 627, 550 P.2d 130 (1976), and the motion may be granted if the sentence originally imposed was for any reason unduly severe. *State v. Lopez,* 106 Idaho 447, 680 P.2d 869 (Ct.App. 1984); *State v. Sutton,* 106 Idaho 403, 679 P.2d 680 (Ct.App.1984). An I.C.R. 35 motion places on the movant the burden of showing the original sentence was unduly severe." *State v. Martinez,* 113 Idaho 535, 536, 746 P.2d 994, 995 (1987) (emphasis added).

Beam's motion alleged that the sentence was imposed in an illegal manner because it was unduly harsh and disproportionate. Secondly, by implication Beam asked the trial court to be lenient and reduce the sentence which was imposed upon him.

■ An evaluation of Beam's motion in light of these rules demonstrates the inadequacy of Beam's allegations. First the legality and proportionality of his sentence was affirmed on direct appeal in *State v. Beam, supra.* Thus, the issue of the legality and proportionality of the sentence is *res judicata.* In effect Beam raised only one ground under I.C.R. 35 that was not already *res judicata,* and that was an appeal for leniency. As we found in the direct appeal, the sentence imposed was within the statutory limits set out by the legislature and we will not disturb it on appeal absent a clear showing of an abuse of discretion. *State v. Seifart,* 100 Idaho 321, 597 P.2d 44 (1979); *State v. Wolfe,* 99 Idaho 382, 582 P.2d 728 (1978). Whether the trial court abused its discretion by not being lenient and reducing the defendant's sentence (which this Court approved and affirmed on direct appeal in *State v. Beam, supra*), "places on the movant the burden

of showing that the original sentence was unduly severe." *State v. Martinez,* 113 Idaho 535, 536, 746 P.2d 994, 995 (1987). The only showing submitted by Beam in support of his Rule 35 motion was his argument that the sentence was no longer proportional after this Court's reduction of the sentence of his co-defendant, Scroggins. However, the proportionality issue was addressed on direct appeal in *State v. Beam, supra,* and this Court held that after comparing Beam's sentence to sentences imposed on all other defendants convicted of first degree murder, Beam's sentence was not disproportionate. Proportionality review must consider a broad spectrum of first degree murder cases, not just one other case such as the *Scroggins* case. Additionally, proportionality review requires comparing different human beings with different personalities, traits and backgrounds. In Scroggins' case, his youth and lack of prior criminal record weighed heavily in this Court's determination that the imposition of the death penalty was not proportional with sentences imposed in other similar cases. The fact that this Court vacated the sentence in *Scroggins,* based substantially upon his youth and lack of prior criminal involvement, does not render the death penalty imposed in this case disproportionate.

The judgments of the district court are affirmed.

SHEPARD, C.J., and HUNTLEY and JOHNSON, JJ., concur.

BISTLINE, Justice, dissenting.

## I.

There can be no doubting that Albert Beam and Michael Shawn Scroggins committed an atrocious murder on a helpless thirteen-year old girl. The district judge imposed death sentences on both. By the courtesy of the Idaho Supreme Court Albert Beam will die, but Michael Shawn Scroggins will live.

The Supreme Court decided Beam's appeal on October 24, 1985, and five weeks later summarily denied a rehearing. 109 Idaho 616, 710 P.2d 526.

The Supreme Court decided Scroggins' appeal on December 19, 1985, and vacated the imposition of the death penalty. Rehearing was denied. 110 Idaho 380, 716 P.2d 1152. Appalled at the discrete appellate treatment accorded the two murderers, my views as to the lack of a fair trial for both defendants and the disparate appellate treatment were summarized at the time in *Scroggins:*

> I am not troubled in joining the Court's judgment to set aside the death penalty. I am greatly troubled that in Beam's case the opinion for the Court did not concern itself with the same considerations. The goal of proportionality is not advanced by the extreme appellate disparity in the treatment of the two cases. The only conclusion now possible is that the convictions in both cases should be reversed, as each of the defendants has requested, and both defendants should stand jointly charged, as they first were and always have been, and should be jointly tried at a trial before one judge and one jury—and thereby let one jury determine which of the two, if either, is less culpable than the other. There is and was no *Bruton* [*v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] circumstance. And, of course, that one jury properly would hear matters in mitigation and aggravation which would be admissible—which is not presently the way things are being done.

110 Idaho at 402, 716 P.2d 1152 (footnote omitted).

The trials of the two defendants were wholly unprecedented and farcical. Jointly charged as codefendants who committed the crime of murder (including rape and attempted rape) the district court succumbed to the whimsical notions of a prosecutor and tried the two both jointly and separately. Each had a separate attorney and a separate jury—all occupying the same courtroom at the same time, other than on one occasion when one defendant was not present when the other testified.

On Beam's appeal, the opinion for the Court stated that Beam on being arrested in Nevada gave a confession which inculpated Scroggins, but failed to add that it was Scroggins who had first induced Beam to flee, after which Scroggins went to the police and accused Beam of the murder. The majority from that point experienced no trouble in upholding both the conviction and the death penalty. Under this Court's lottery scheme for assignment of cases, the authorship of the *Scroggins* opinion fell to a justice other than the author of the *Beam* opinion. The *Scroggins* author, displaying the same concerns as to that defendant's youthful age, emotionally disturbed childhood, and diminished mental capabilities as were present in the Eddings opinions,[1] wrote convincingly to vacate the death penalty and garnered a majority. Scroggins on resentencing by a substitute judge was awarded a lifetime of imprisonment. The district court's findings in both cases, *Scroggins* and *Beam,* are about on a par insofar as age and disturbed childhood are concerned,[2] but it is at one glance inescapably apparent that in Beam's case the district court glossed over Beam's diminished mental capacity (defendant is not mentally ill, but does suffer from certain learning disabilities because of the poor home environment and social pathology) and did not accurately portray that Beam's sexual deviancy was forced on to him as a small child.

The district court which had sentenced both Scroggins and Beam on receiving this Court's opinion in the Scroggins case and another unrelated murder case involving two defendants who had by the same judge also been handed death sentences, expressed himself in language not capable of being misunderstood as to the culpability of Scroggins as compared to Beam. The district court's order of self-disqualification in Scroggins' case must be read in full in order that a fair determination can be made

---

1. *Eddings v. State,* 688 P.2d 342 (1984); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) on certiorari from Court of Criminal Appeals of Oklahoma, 616 P.2d 1159 (1980).

2. The district court's findings are attached hereto as Scroggins, Appendix A, and Beam, Appendix B.

as to the propriety of the district court's refusal to likewise disqualify himself on Beam's post-conviction proceedings:

In reviewing the opinions of the Supreme Court, it appears that the majority of its members concur with the findings of this court in all particulars except that, in making their own 'qualitative reviews of the record', the Supreme Court determined that the sentence of death in the *Windsor* and *Scroggins* cases was excessive and disproportionate.

In 25-years on the bench, this court has never failed to carry out the mandates of the Supreme Court. And this court has the highest respect for each and every member on the appellate bench. However, the Court's decision in [*State v.*] *Windsor* [110 Idaho 410, 716 P.2d 1182 (1985)] and *Scroggins* present a situation wherein this court not only disagrees with the newly enunciated doctrine of 'paramount exercise of discretion' by the Supreme Court, but cannot in good conscience impose or sign a Judgment upon remand that is not it's own, and with which it disagrees....

With all due respect, it is difficult for this court to believe that such a 'qualitative review' undertaken by the Supreme Court is more legitimate than the trial court's assessment after having personally participated in all the proceedings and having had the first-hand opportunity to evaluate the facts, circumstances, and persons involved in a capital case, particularly when two members of the Supreme Court are predisposed to find against the legitimate imposition of a death sentence when it is prescribed by the court as opposed to a jury. Rather, the decision-making responsibility always has been and always should be in the trial court, and only when there is determined to be an *abuse* of that Court's discretion should an appellate court intercede. The United States Supreme Court held in *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), that sentencing by a trial judge satisfied both the Sixth and Eighth amendments because 'a trial judge is more like a jury than he is like an appellate court. Like a jury, he has seen the witnesses and is well positioned to make those determinations of demeanor and credibility that are peculiarly within a trial judge's province.' The same can be said for all the nuances involved in the trial of a capital case which are not 'in the record' but which are within the observations and knowledge of the trial judge, including community outrage and/or tolerance, community expectations and societal goals, the rights and needs of a victim's family, and the totality of the circumstances surrounding the defendant.

The records in the *Windsor* and *Scroggins* cases amply support the determination that both defendants personally intended that their victims suffer death, a finding made by both the trial court and the jury which satisfies the Eighth Amendment as well as the rule of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Yet, even though findings regarding the personal responsibility and moral guilt of each defendant were made by the trial court and are supported by the evidence, these defendants have escaped punishment for their actions equivalent to those imposed on their co-defendants, whose death sentences have been affirmed on appeal. Despite a record which strongly indicated that in their respective cases both Scroggins and Windsor were *the* motivating forces behind the commission of the crime and were in fact the catalysts which set the crimes in motion, a situation has resulted which suggests that 'where the death of another is attempted by two people ..., he or she who was less successful must yield the hangman's noose to the one to whom must go the honor of inflicting the blow or wound which gains the medical credit for producing the victim's expiration.' 85 I.S. C.R. at 2566 (Justice Bistline's separate opinion). In both cases it is clear that both Windsor and Scroggins knew that the victim was to be killed and were actively and inextricably entwined in the victim's fate. With the possible excep-

tion of the Creech cases, where there have been multiple deaths, this court is not aware of any murder case in this state where the death penalty has been upheld which would offend the average person more than the facts presented in *Windsor* and *Scroggins*....

Identified in the *Scroggins* opinion as justification for vacating the death sentence was Scroggins' lesser criminal involvement in the killing of 13-year-old Mondi Lenten, compared to that of co-defendant Beam, as well as his unstable upbringing, mental and chronological age, level of cooperation, and lack of history of violent criminal conduct. However, the record in this case supports the conclusion that any disparity between Scroggins' and Beam's participation is a distinction with little difference. It is true that the Scroggins' jury did not find him guilty beyond a reasonable doubt of slitting his victim's throat, but neither did the jury so find in Beam's case: yet it most certainly happened, and both defendants are legally responsible. Additionally, while Scroggins was convicted of the included offense of Attempted Rape and Beam was convicted of Rape as charged, the Scroggins verdict must be viewed in light of the evidence. It is inconceivable to this court that Scroggins should be given any consideration in the sentencing process for the disparity of the verdicts when the only reasonable explanation for Scroggins not accomplishing the rape, in light of all the other evidence, was that his victim, in a final and desperate measure, forced a bowel movement in the hope that the excrement would turn Scroggins away, and when the evidence indicates that he still forced her to commit an act of fellatio upon him. Also, the fact that Scroggins reported the crime has to be viewed in context in order to see it for what it was. First, Scroggins went home and went to sleep with no pangs of conscience after having been involved in a brutal slaying. The next day, under parental influence, and with co-defendant Beam on the run and a handy 'fall guy', Scroggins went to the police. No one

involved in this case—police, investigators, the jury, or this court—has ever found or believed that Scroggins told the truth about what happened to Mondi Lenten, except to the extent that he did lead the police to the crime scene, which he of course had to do in attempt to place the blame on Beam, his supposed friend. Additionally, while the Supreme Court's opinion suggests that the trial court weighted Scroggins' likely performance in a penal setting more heavily than it in fact did in support of the decision to impose the death sentence, a recent check with the warden of the Idaho State Penitentiary demonstrated that this court's assessment was borne out upon Scroggins release from death row, whereupon his conduct caused him to be first placed in the 'hole', and then in close or protective custody. Finally, this court carefully considered the mitigating factors identified by the Supreme Court in its opinion prior to determining at the time of sentencing that the mitigating factors did not outweigh Scroggins' culpability for the crime and the nature of his character.

(Order of Disqualification by Judge Edward J. Lodge, in Canyon County Case # C–5527, May 16, 1986; R. 192a)

Attention is drawn to the district judge's acute observations of Scroggins' degree of complicity as compared to the above quotation from the opinion for the court.

As to what consideration the district judge made as to his mitigation findings (1) through (6) page 5, he stated only "that the mitigating factors do not outweigh the gravity of the aggravating circumstances ..." This appears to be an insufficient compliance with the *Eddings* decision of the Supreme Court of the United States. In my view there was in Beam's case a violation of the spirit if not the letter of the *Eddings* holding, 102 S.Ct. 869.

But more than that, I perceive, as a result of this Court's interference in Scroggins' case, a complete failure of the proportionality which is both federally and state of Idaho mandated. I am surprised that

such does not manifest itself in the eyes of any of the other members of this Court.

The issue before us, however, is the related one as to whether the district judge who imposed like sentences upon Beam and Scroggins could act impartially at the time Beam's post-conviction proceedings were ready to be heard, and also his request for clemency. I have at all times been convinced that he could not do so, and voted for the issuance of a requested writ of mandate which would have directed him to step aside.

What appears very clearly here is a district court engaging in a direct confrontation with the state Supreme Court. The district court was obviously of the opinion that the Supreme Court erred mightly in relieving Scroggins of the death penalty. It is a highly unusual situation, but no one could rightly assert that the district court was not justified. Before that order ever crossed my desk I had written in the *Scroggins* case of the total lack of proportionality of the eventual Scroggins and Beam sentences, especially as viewed in light of simultaneous trials of two defendants with two separate juries—when there was absolutely no justification under the *Bruton* rule for such a charade.

It seems all too clear that the district judge in recusing himself from any further participation in Scroggins' case remained firmly entrenched in the view that both should die. Where the Supreme Court spared Scroggins my comprehension of human nature is that the district judge could not be expected to give Beam any relief whatever. Moreover, and adding impetus to the trial court's firmly entrenched views, one would die and one would live, all would know that this was a travesty, but the blame would forever be laid at the feet of the Idaho Supreme Court, which is exactly what is happening. This Supreme Court is *not* going to allow itself to be told by a district judge that it erred grievously in slipping the noose from around Scroggins' neck, and make amends by giving Beam any taste of proportionality.

To me this is not unexpected—and it does little to improve the Court's image.

Not as a Johnny-come-lately, but even at the time the Court determined to spare *Scroggins,* I spoke out against the failure to achieve proportionality and the failure to afford Beam an ordinary trial—rather than one in a carnival environment replete with error and prejudice:

Two pages later an Addendum pointed to the fact that the *Beam* reporter's transcript inaccurately failed to show that Beam had been subjected to cross-examination by Scroggins' counsel—a complete fulfillment of the otherwise problem of nonconfrontation which produced the *Bruton* rule in the first place. What a comedy! It was the *Bruton* circumstance which the prosecutor, of all people, had utilized to obtain this peculiar hybrid severance.

What came out of it all was Beam testifying against Scroggins, who was indeed awarded the right of confrontation which was exercised by cross-examination (you cannot cross-examine a confession), and Scroggins thereafter testifying against Beam who was not accorded confrontation by cross-examination. Nevertheless by direct order of the court, Beam's trial being over, Beam and his attorney were confined to the courtroom while Scroggins took the stand and laid on Beam all the blame for the killing.

I mentioned early in the *Beam* opinion, first at p. 36 and again at p. 57, it was the prosecutor's worry that if Beam and counsel were not required to be present as the Scroggins trial continued on that "with lay members sitting on a very new law process, *that an improper conclusion could be drawn from the absence of Mr. Beam at this critical point.*"

Having first ruled that Beam and his attorney need not be present, the trial judge succumbed to the prosecutor's unexplained gut feeling of improper jury conclusions, and reversed his ruling. In the Addendum I pointed out exactly how this would appear to the jury:

When Scroggins testified, it was only because the trial court reversed its ruling that Beam and his attorney were even in the court room, ... but under

the court's previously declared absolute control over the proceedings, ... sat there like dummies with Beam's attorney having no opportunity to cross-examine.

Just as the prosecutor had worried, the lay jurors did jump to a conclusion, and there is only one reasonable conclusion that the jurors could come to. Where those jurors had previously seen Mr. White, Scroggins' attorney, thoroughly cross-examine Beam, obviously those jurors would believe that Beam's attorney did not believe that he could make any inroads whatever against Scroggins' direct testimony. *In other words, the jury saw Beam and his attorney offer not the slightest effort at challenging the testimony just given by Scroggins.* Otherwise put, Beam and his attorney were seen as conceding the validity of that testimony. This accounts for a jury verdict in Scroggins' trial which exonerated him from the actual killing and from the rape. It is as wrong as anything which I have witnessed in a criminal prosecution. Scroggins was clearly the beneficiary of the court's erroneous ruling, and it was the prosecutor who led the court into such grievous error. And in the first place it was the prosecutor who led the court into the error of attempting to conduct two "almost" separate trials in one courtroom with two juries.

There is little doubt in my mind, almost none in fact, that the prosecutor's cross-examination of Scroggins established him for the liar he was in first giving false statements to the police officers. But, with Beam and counsel apparently seeing no reason to cross-examine Scroggins, the jury, if so inclined where Scroggins was by them convicted of felony murder, could readily let itself entertain a reasonable doubt that Scroggins was not guilty of rape, and not guilty of actually killing or participating in the actual killing.

The jury has so ruled, and no matter how it was deceived and misled by appearances—*i.e.,* drew improper conclusions, as the prosecutor worried—nothing can be done in that regard. That verdict is final. The state has not challenged it, and no one else has standing to challenge it.

If there is to be any proportionality in death penalty sentencing, however, it is only just that the Court now pause to reconsider Beam's death sentence. And it can do so. In *State v. Ramirez,* 34 Idaho 623, 203 P. 279 (1921), the Court recalled its remittitur to further consider its earlier judgment which had affirmed a conviction of first degree murder and punishment *fixed by the jury* at death. *State v. Ramirez,* 33 Idaho 803, 199 P. 376 (1921). Having recalled the remittitur, and upon further consideration, the Court stated:

> The questions involved here are of the utmost importance to appellant, and every consideration of justice demands that this court determine its power both to recall the *remittitur* and to reduce the punishment in this case, and that the punishment be reduced if the facts do not warrant the imposition of the death penalty. *Ramirez, supra,* 34 Idaho at 631, 203 P. at 281–82.

The Court thereafter declared its inherent power to do so, *id.,* at 631, 203 P. 279. (It has done so in subsequent cases.) The Court was short and to the point:

> Without reciting in detail all of the facts and circumstances involved in the trial of this cause, and specifically pointing out errors which were not reversible, but which may have influenced the jury in assessing the extreme penalty, it is clear to our minds *that the jury abused its discretion in so doing.*
>
> We have, therefore, after very careful consideration, reached the conclusion that it is our duty to recall the *remittitur,* and to modify the judgment to the extent that the sentence to be inflicted be that of life imprisonment at hard labor in lieu of inflicting the death penalty, and the judgment is so modified.
>
> *Id.* at 637–38, 203 P. at 284.

If this Court today is to display the quality of justice it showed i:: *Windsor*, and now in Scroggins' case, it will at least recall the remittitur in Beam's case so that it will afford itself the opportunity of considering the injustice which is being done by letting Beam be sent off to his death—while at the same time waving boldly the banner of proportionality while sending Scroggins off to a sentence less severe. If it does recall the remittitur, it will at the least establish to a somewhat doubtful bar that the other members sometimes read what my research reveals in these important cases of most grave consequence. As I intimated over three months ago in *Beam*, then not knowing how the Court would pass upon Scroggins' appeal:

> What also comes across to me from reading the testimony of both defendants, and examining their statements given to the police detectives, is that Beam is as much the mentally slow person as was Bainbridge as compared to Sivak. *Beam*, 109 Idaho at 644, 710 P.2d at 554.

As above observed, I mentioned the statements given to the police detectives by Beam. This was prior to his having any advice from an attorney, or from anyone. Freely admitting his complicity, as did Scroggins (who was the first one to go to the police and point the finger of guilt at Beam), Beam's mentality was such that not at all displaying any regard for his life which was then at stake, his prime concern was whether he would get bacⁱ the cherished pair of handcuffs which he said his friend Shawn Scroggins had given to him. 110 Idaho at 392–94, 716 P.2d 1152 at 1164–66 (1986).

It is also important to keep in mind that this Court's opinion in Beam's case made *no* mention of *Eddings*. The *Scroggins* opinion released a few weeks later relied upon it and quoted from it. 110 Idaho 380 at 388, 716 P.2d 1152 at 1160. My reference to Beam in connection therewith went unnoticed, but was appropriate:

> The Court's opinion places a considerable reliance on *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, quoting extensively from it. I do not disagree that this is correctly done. In this area of criminal law the High Court has occupied the field, having in the first place opened the field with its *Furman* and *Woodson* [*v. State*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944] opinions. If Scroggins has a valid issue under *Eddings*, then it is in order that we do not duck it. And we do not. Our opinion notes that Scroggins, with a mental age of 13.8 years, was in his formative years supervised by the Department of Health and Welfare because of his unstable, unnurtured and inadequate upbringing, and that although he had reached the age of 18 years, 'We cannot ignore the (*Eddings*) Court's admonition that "youth is more than a chronological fact." ' 110 Idaho at 388, 716 P.2d at 1160. Our opinion notes that 'Just as Eddings was not a normal sixteen-year-old, Scroggins was not a normal eighteen-year-old. Like Eddings, Scroggins had been deprived of the "care, concern and parental attention that children deserve." Also like Eddings, Scroggins' mental and emotional development were at a level well below his chronological age.'

To which I add, everything which has been said about Eddings and Scroggins is applicable to Beam. If anyone has had a more miserable, pitiful, disgusting and deplorable early life than Beam, that person is not Eddings and it is not Scroggins. Beam, as true of Scroggins, simply did not have the mental wherewithal to make the decisions we expect of a normal properly brought-up person. Moreover, there is extremely good reason to believe, as apparently did the prosecutor and the presentence investigator, that Scroggins was the liar and the schemer who both murdered or participated in the murder and set Beam up to take the rap.

## II.

I concede that most of the errors committed as a result of the unprecedented trial procedure have already been given this Court's stamp of approval on the direct appeal. That does not, of course, have any

application to the validity of I.C. § 19–2719 and its 42–day requirement. In his opinion Justice Bakes does treat with this new issue, and he sets out the legislative statement of purpose—which is to thwart death penalty defendants from extending post-conviction review for as long as possible.

This particular piece of legislation presents good cause for concern. For certain it is special legislation in that it drastically purports to shorten the time in which to apply for post-conviction relief. For a man on death row the 42 days allotted is probably meaningless. For his attorney, however, I would venture that it is such a short time as to have a devastating effect upon an attorney's intentions of pursuing relief long before there has been sufficient time to appraise the situation.

True, it serves the laudable purpose of not causing such defendants to suffer from the agony of suspense over a long period of time, and works a saving to the state treasury. Equally true, such a shortness of time cannot but diminish the probabilities of putting together the kind of a showing which is not a product of haste, ignorance of facts, or both.

Without knowing, as is conceded, one might suspect the legislature acted at the behest of the same deputy attorney general who fashioned Idaho's death penalty sentencing scheme which completely took out of the act a defendant's jury of his peers. The rush to judgment may be found unjustified as the trial bench and bar follow the statute in action. The next bit of remedial legislation such as this may be to deny Idaho death defendants the right to seek federal habeas corpus relief.

It is to be remembered that the Idaho post-conviction relief procedures were enacted to substitute for Idaho habeas corpus procedures. It may very well be that such defendants may have to use the habeas corpus procedures in order to obtain any redress in light of the oppressively short time limitations provided by the act. Where the legislature's act has selected 42 days as the appropriate time, one is caused to wonder if the Idaho Supreme Court had, as it did with the Traffic Infractions legislation, a hand in the drafting.

APPENDIX A

In the Supreme Court of the State of Idaho

Filed March 21, 1984

Supreme Court No. 15457.

District Court No. C–5527

State of Idaho, Plaintiff,

-vs-

Michael Shawn Scroggins, Defendant.

REPORT ON IMPOSITION OF DEATH PENALTY UNDER SECTION 19–2827, IDAHO CODE

The Court having sentenced the above defendant to death for the conviction of the offense of First Degree Murder in the perpetration of, or attempt to perpetrate, rape,

NOW THEREFORE, the Court hereby makes a report to the Idaho Supreme Court pursuant to Section 19–2827, Idaho Code, as follows:

1. Facts regarding defendant:

   (a) Age: 18

   (b) Sex: Male

   (c) Race: Caucasian and Indian

   (d) Marital status: Single

   (e) Family Relationships: Father and Mother, four brothers and one sister.

   (f) Dependents: None.

   (g) Occupation or Trade: Landscaping and mechanics

   (h) Educational Background: Completed seventh grade of formal education.

   (i) Relationship to Victim of Offense: None.

2. Defense Counsel: Kenneth F. White
   Attorney at Law
   P.O. Box 1099
   Nampa, Idaho 83651

3. Summary of Prior Convictions: See attached sheet.

4. Findings in Support of Imposition of Death Penalty: See attached copy.

5. Date Set for Execution of Sentence: April 13, 1984.

   Dated this 19th day of March, 1984.

   (s) Edward J. Lodge
   District Judge

In the District Court of the Third Judicial District of the State of Idaho, in and for the County of Canyon

Case No. C–5527

State of Idaho, Plaintiff,

vs.

Michael Shawn Scroggins, Defendant.

## FINDINGS OF THE COURT IN CONSIDERATION OF THE DEATH PENALTY PURSUANT TO SECTION 19–2515, IDAHO CODE

The above-named defendant having been convicted of the criminal offense of First Degree Murder in the perpetration of, or attempt to perpetrate, rape, which under the law authorizes the imposition of the death penalty; and the Court having ordered a pre-sentence investigation of the defendant and, thereafter, having held a sentencing hearing for the purpose of hearing all relevant evidence and argument of counsel in aggravation and mitigation of the offense;

NOW THEREFORE the Court hereby makes the following findings:

1) *Conviction.* That the defendant, while represented by counsel, Kenneth F. White, of Nampa, Idaho, was found guilty by jury verdicts of the offense of First Degree Murder in the perpetration of, or attempt to perpetrate, rape, and the offense of Attempted Rape.

2) *Pre–Sentence Report.* That a pre-sentence report was prepared by Order of the Court and delivered to the defendant or his counsel at least seven (7) days prior to the sentencing hearing, pursuant to Section 19–2515, Idaho Code, and Rule 33.1, Idaho Criminal Rules.

3) *Sentencing Hearing.* That a sentencing hearing was held on March 8, 1984, pursuant to notice to counsel for the defendant and the State, and that at said hearing in the presence of the defendant, the Court heard relevant evidence in aggravation and mitigation of the offenses and entertained arguments of counsel thereon.

## FACTS AND ARGUMENTS FOUND IN POSSIBLE MITIGATION

In an effort to comply with the mandates of *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), Idaho Code Section 19–2515(d), and Idaho Criminal Rules 33.1 and 33.2, this Court finds the following as possible mitigating facts:

1) Defendant is eighteen years of age. But the Court finds that he is not new to the criminal justice system and has a certain sophistication about the same that is not typical of a normal eighteen-year-old.

2) Defendant was found guilty of Attempted Rape rather than Rape, as charged.

The defendant, however, assisted and witnessed the rape of the victim by the co-defendant, yet did nothing to help her.

3) Defendant, after a discussion with his mother and Wes Short, reported the crime to the police.

The defendant, though, waited until the co-defendant left town and then basically placed the entire blame on him. His story was inconsistent with many of the facts and was not believed by the jury, by the investigators, or by this Court.

There are many circumstantial facts that place this defendant at the scene of the murder, including the statement of the co-defendant to his girlfriend shortly after the incident occurred but before he was a suspect or had reason to fabricate his story. Sandra Whalen testified that co-defendant Beam was crying and said that "he and Scroggins rape and murdered a thirteen-year-old girl. 'I don't know who did it, but I think I did.'"

4) Defendant was physically and mentally abused in an unhealthy home environment.

5) Defendant does not have any prior felonies as an adult, but there was a series of commitments for problems that prevailed during his minority. (Health and Welfare; Yellowstone Boys Ranch in Montana; St. Alphonsus Hospital Mental Health Unit)

6) The jury found that the defendant did not directly kill the victim.

Inasmuch as they did find that he aided and abetted, encouraged and advised its commission, the Court finds that this is really a difference without a distinction considering the time period and the torture the victim suffered prior to her death.

The jury found that the defendant did not use the knife to cut the victim's throat that was cut four (4) times, but so did the jury in co-defendant Beam's case find that Beam did not use the knife. It is vividly clear that one or both of them did in fact cut this victim's throat.

7) Defendant is not on probation or parole, but is under the supervision of the Department of Health and Welfare until his twenty-first birthday.

8) Defendant's IQ scores place him in the Dull Normal Range, but he does know the difference between right and wrong, and there were no significant indications of brain damage according to the psychological report.

### FACTS AND ARGUMENTS FOUND IN SUPPORT OF AGGRAVATION

1) The killing was exceptionally cruel and senseless. The victim was enticed under false pretenses to leave her home around midnight, was then taken to a secluded area, handcuffed, raped by the co-defendant, and then attempted to be raped by this defendant. The co-defendant said she was sodomized and forced to have oral sex by this defendant, and, after being told that she was going to be killed, was taken by the defendants to the canal where repeated efforts were made to drown her. When that was unsuccessful, her throat was cut no less than four times, and then she was held under water by the co-defendant until her last signs of life ebbed away.

2) The defendant exhibited utter disregard for human life by not going to her aid, but in fact, to the contrary, aided and encouraged her demise so she could not tell. Her body was left in the muddy and murky waters of the canal. The defendant then went to Wes Short's home and, according to the testimony, was able to go to sleep within twenty minutes. This surely demonstrates the utmost callous disregard for human life.

3) The crimes were the result of a plan and scheme initiated by the defendants in the home of Mondi Lenten. The evidence is undisputed that the defendants, while in the bathroom together, conspired to take one of the two girls away from the home on the pretense that they would smoke pot. The scheme was made clear by the fact that *only one* of the girls could go even though it was almost midnight and the two girls were staying together at the Lenten home. Neither of the defendants had the marijuana they represented they had, and as soon as Mondi Lenten was in the secluded area selected by the defendants, she was handcuffed, stripped of her clothing with the use of a knife, and assaulted. There is no dispute but what the victim's body was battered and bruised, and that there was blood in her crotch area even though she was not menstruating.

4) The record is void of any provocation on the part of the victim. According to the defendants, she was going along with them and did not resist the rape by the co-defendant.

5) The defendant was not under the influence of any mind-controlling drug and/or alcohol.

7) The defendant's involvement in criminal activity as a juvenile and the constant need for confinement in various institutions vividly demonstrates that the defendant has a propensity to commit crime and will probably constitute a continuing threat to society.

Dr. Webb, as early as 1965, found the defendant to be severely disturbed and a danger to himself and to society. Then in 1984, Dr. Webb again found that the defendant is unpredictable and/or dangerous to himself and to others. (See reports attached hereto.)

8) Test data also suggests that, under stress, defendant may regress, impulsively giving into unrestrained sexual gratification and/or aggression, or that he may

withdraw into a fantasy world, become apathetic, and show disorders of thinking and confusion.

9) The defendant has received extensive counseling over an extended period of time (since approximately ten years of age), all to no avail.

10) The defendant has shown little or no remorse for the crime and, in fact, has probably shown less emotion or feeling than any defendant this Court has witnessed in nineteen years on the bench.

11) The jury found, by jury verdict, that the defendant aided and abetted, encouraged and advised the commission of the crime. That verdict, under the Court's instructions, means that the defendant shared the criminal intent of the perpetrator of the crime, and that he intentionally and with malice killed Mondi Lenten.

12) Defendant was committed to the Department of Health and Welfare after having difficulties in three different states for inappropriate behavior, demonstrated through fire setting and lewd and lascivious acting out. While incarcerated on this charge, he started a fire in the jail.

The fact that he is described as a follower rather than a leader is no consolation to this Court, but only increases my fears that the defendant could be easily influenced to do harm to himself or to others. It appears that the defendant has problems separating fantasy from reality and at times acts out his behavior in the form of aggression.

13) Both defendants demonstrated the cowardliness of their characters by blaming the other for the sadistic death of Mondi Lenten even though the evidence is clear that they both were involved from the very beginning.

## STATUTORY AGGRAVATING CIRCUMSTANCES PROVED BEYOND A REASONABLE DOUBT

1) The murder was especially heinous, atrocious and cruel, manifesting exceptional depravity (5).

2) By the murder or circumstances surrounding its commission, the defendant exhibited utter disregard for human life (6).

3) The murder was one defined as Murder of the First Degree under Idaho Code 18–4003(d), and it was accompanied with the specific intent to cause the death of a human being (7).

## REASONS FOR THE DEATH PENALTY

Serious consideration of sentencing alternatives is necessarily confined to two dispositions when one realistically considers the gravity and nature of the offense, the behavioral patterns exhibited not only in this case, but in the history and background of this defendant, and by reason of the fact that the Court has determined from the record and evidence before the Court that the defendant is not likely to ever become a functional member of society.

Those two alternatives are death, or a fixed sentence.

In the Court's judgment, a fixed life sentence is wrong even though by jury verdict the defendant's participation in the crime was not direct and even though defendant's criminal adult record is not as extensive as that of the co-defendant.

1) The record is clear that extensive efforts have been made to treat and to rehabilitate the defendant, with no measurable success.

2) Defendant's psychological evaluation describes him as unpredictable and dangerous to others; in a penitentiary setting his condition can only worsen. His overall test profile is indicative of a pre-psychotic personality with a pre-disposition toward paranoid schizophrenia.

It would be a violation of this Court's conscience to believe that effective treatment is available to the defendant in a penitentiary setting, or that funds would be expended by the State in a different environment with a fixed life sentence.

3) The nature of the crime, the age of the defendant, his intelligence level (dull normal range), his physical and mental appearance and his ingrained sexual fantasies

and abnormal behavior would assure his being victimized in the penitentiary unless he was kept confined and away from other inmates, in itself a form of cruel and unusual punishment for the rest of his life.

4) Putting a person in the penitentiary who realistically is incapable of being rehabilitated, based on any objective criteria, likewise victimizes society, as well as Mondi Lenten, in that the costs of institutionalization are prohibitive if there is no light at the end of the tunnel.

Just as importantly, it is the belief of this Court that even people within the penitentiary, insofar as is humanly possible, are likewise entitled to certain protections, and to subject them to a person of this makeup and personality is also a form of cruel and unusual punishment.

The Court finds that the defendant intentionally and actively aided and abetted, encouraged or advised the co-defendant to kill Mondi Lenten; and that his personal responsibility and moral culpability in this cruel and merciless slaying are clearly evident from the record.

The victim did nothing to provoke the killing other than to place her trust and confidence in the defendant.

The intentional and malicious killing took from the victim what an offender can never restore—the fragile gift of life.

The defendant's actions were void of human compassion or understanding, and embodied the ultimate affront to society.

A separate Court found the rape and murder by drowning of Daralyn Johnson, a nine-year-old girl, to be so heinous and atrocious as to mandate the imposition of the death penalty.

Mondi Lenten and the boys and girls who use the sidewalks and streets of our community cry out that this Court be responsible to the will of the people and to its conscience and to take the action that is necessary to help deter others from committing like crimes.

It is clear from the record and the facts of this case that the mitigating circumstances do not outweigh the gravity of the aggravating circumstances so as to make unjust the imposition of the death penalty. In fact, because of the gravity of the offense and the strong factors weighing against any possibility of rehabilitation, any one of the aggravating circumstances found by this Court to exist outweighs the mitigating circumstances. The defendant, by his own actions, has forfeited his right to live.

No legal cause to the contrary has been shown, and it is the judgment of this Court that the death penalty should be imposed on the defendant for the capital offense of which he was convicted.

IT IS, THEREFORE, ADJUDGED that the defendant is guilty of First Degree Murder in the perpetration of, or attempt to perpetrate, rape, and that he should be sentenced to death by the Idaho State Board of Corrections in a manner prescribed by law on April 13, 1984.

IT IS FURTHER ADJUDGED AND DECREED that the defendant is guilty of Attempted Rape by verdict of the jury and should be sentenced to the Idaho State Board of Corrections for a fixed period of time of ten (10) years.

Dated this 19th day of March, 1984.

(s) Edward J. Lodge
District Judge

APPENDIX B

In the Supreme Court of the
State of Idaho

Filed March 21, 1984

Supreme Court No. 15453.

District Court No. C–5527

State of Idaho, Plaintiff,

-vs-

Albert Ray Beam, Defendant.

REPORT ON IMPOSITION OF DEATH PENALTY UNDER SECTION 19–2827, IDAHO CODE

The Court having sentenced the above defendant to death for the conviction of the offense of First Degree Murder with deliberation and premeditation,

NOW THEREFORE, the Court hereby makes a report to the Idaho Supreme Court pursuant to Section 19–2827, Idaho Code, as follows:

1. Facts regarding defendant:
   (a) Age: 21
   (b) Sex: Male
   (c) Race: Caucasian
   (d) Marital Status: Single
   (e) Family Relationships: Father and Mother, two brothers and one sister.
   (f) Dependents: Defendant claims one child born out of wedlock when defendant was approximately fourteen years of age. Not supporting him.
   (g) Occupation or Trade: Cook, auto mechanic or farm laborer.
   (h) Educational Background: To seventh grade, then special education from 9–23–75 to 9–5–78.
   (i) Relationship to Victim of Offense: None.

2. Defense Counsel: Van Bishop
   Public Defender
   Canyon County, Idaho

3. Summary of Prior Convictions: See attached sheet.

4. Findings in Support of Imposition of Death Penalty: See attached copy.

5. Date Set for Execution of Sentence: April 13, 1984.

Dated this 19th day of March, 1984.

(s) Edward J. Lodge
District Judge

In the District Court of the Third Judicial District of the State of Idaho, in and for the County of Canyon

Case No. C–5527

State of Idaho, Plaintiff,

-vs-

Albert Ray Beam, Defendant.

FINDINGS OF THE COURT IN CONSIDERATION OF THE DEATH PENALTY PURSUANT TO SECTION 19–2515, IDAHO CODE

The above-named defendant having been convicted of the criminal offense of First Degree Murder with deliberation and premeditation, which under the law authorizes the imposition of the death penalty; and the Court having ordered a pre-sentence investigation of the defendant, and thereafter having held a sentencing hearing for the purpose of hearing all relevant evidence and argument of counsel in aggravation and mitigation of the offense;

NOW THEREFORE, the Court hereby makes the following findings:

1) *Conviction.* That the defendant, while represented by Canyon County Public Defender Van Bishop, was found guilty by jury verdicts of the offenses of First Degree Murder with malice, premeditation, and deliberation, and Rape.

2) *Pre–Sentence Report.* That a pre-sentence report was prepared by order of the Court and was delivered to the defendant or his counsel at least seven (7) days prior to the sentencing hearing pursuant to Section 19–2515, Idaho Code, and Rule 33.1, Idaho Criminal Rules.

3) *Sentencing Hearing.* That a sentencing hearing was held on March 8, 1984, pursuant to notice to counsel for the defendant and the State, and that at said hearing in the presence of the defendant, the Court heard relevant evidence in aggravation and mitigation of the offenses and entertained arguments of counsel thereon.

## FACTS AND ARGUMENTS FOUND IN POSSIBLE MITIGATION

In an effort to comply with the mandates of *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), Idaho Code Section 19–2515(d), and Idaho Criminal Rules 33.1 and 33.2, this Court finds the following as possible mitigating facts:

1) Defendant is twenty-one (21) years of age.

2) Defendant was raised in a turbulent family setting that included alcohol and drug abuse, sexual deviancy, and educational deprivation.

3) Defendant was cooperative with law enforcement upon his arrest and admitted

his involvement in the commission of the crimes.

4) Defendant testified in the State's case as to the culpability of the co-defendant, Scroggins, and as to his own involvement (not believed by jury, however).

5) Defendant has limited employment skills as a cook and a mechanic.

6) Defendant is not mentally ill, but does suffer from certain learning disabilities because of the poor home environment and social pathology.

## FACTS AND ARGUMENTS FOUND IN AGGRAVATION

1) The killing was exceptionally cruel and senseless.

The victim, a thirteen-year-old girl, was enticed into a secluded area, handcuffed, raped by the defendant, sodomized and forced to engage in oral sex by the co-defendant, according to Mr. Beam, and was told that she was going to be drowned. She was then taken to a canal some distance away while still handcuffed, where she was repeatedly submerged in the water until additional force was necessary, and then her throat was cut four or five times by one of the defendants.

2) The defendant exhibited utter disregard for human life by holding the victim's head under water until the last signs of life were gone, and then left her body in the muddy and murky waters of the canal.

3) The crimes were the result of a plan and scheme initiated by the defendants in the home of Mondi Lenten. The evidence is undisputed that the defendants, while in the bathroom together, conspired to ask Mondi Lenten or her friend, Donnette Fargher, if either of them, but only one, would like to go with them to smoke marijuana and get high. Neither of the defendants had any marijuana, and as soon as they got Mondi into a secluded area, they stripped her of her clothing with the use of a knife, handcuffed her, and commenced the sexual assault. The evidence is clear that the victim's body was not only battered and bruised, but also had blood in the crotch area even though she was not menstruating.

4) The record is void of any provocation on the part of the victim, but in fact shows that she had gone along with the defendants trusting in their friendship.

5) The cold-blooded manner in which the victim was raped and killed by the defendant manifested such depravity as to offend all standards of human compassion, feeling or decency; the actions and conduct of the defendant were deliberate, malicious, and done with the specific intent to cause the death of Mondi Lenten.

6) While the defendant had ingested or smoked a marijuana cigarette earlier in the day which he alleges was also laced with PCP, the commission of this crime did not occur until after midnight, and there is no evidence to suggest that the defendant was at that time under the control or influence of any mind-controlling drug and/or alcohol. Defendant's actions immediately after the killing clearly demonstrate that he was weighing the pros and cons of what he had done, and that plans were made to flee the area.

7) The motive for killing the victim was clearly to silence her so she could not tell on, or report, the defendants. The defendant, Beam, was on parole from the Idaho State Penitentiary, and he knew that Donnette Fargher could place the victim with him. Any evidence of having assaulted a thirteen-year-old girl would have placed him back in custody for many years, and he knew it.

8) The defendant's record is extensive both as a juvenile and as an adult in light of his age. He is described by collateral contacts as a social outcast, a substance abuser, and a thief.

Based on the BETA Parole Assessment Classification scale, defendant was given a one in eight chance of being successful on parole when he was paroled in November of 1982. This crime was committed in July of 1983 while defendant was on parole.

The defendant was not successful on the 120–day program before going to the penitentiary and is believed to be virtually un-

employable because of his social pathology and learning deficits.

9) The prognosis for any substantive rehabilitation is non-existent.

The psychological evaluation describes the defendant as a person who lacks an adequate conscience, who is impulsive, and who uses others to satisfy his own personal needs.

Defendant has a long history of deviant sexual behavior, including incest, homosexuality, and abnormal sexual relationships with women both older and younger than the defendant.

The report describes the defendant as one inclined to use poor judgment and who at times acts out his basic hostility by being abusive to both people and animals. (See reports attached.)

10) In support of the Court's finding that the defendant has a propensity to commit murder, which will probably constitute a continuing threat to society, all one has to consider is the ease with which the defendant committed this crime; his total lack of remorse; his abuse of people and animals; the psychological evaluation which finds that there is a lack of adequate conscience development and that he is unable to feel with and/or for another person; Sandra Whalen's (defendant's girlfriend) statements that defendant would often get extremely angry and report that he was going to kill the individual with whom he was angry; Ricky Chilton's testimony that Beam said he was going to cut his guts out; the fact that he was found with a razorblade attached to a toothbrush in jail, which a jailer testified was typically used for a dangerous weapon. All suggest that the defendant is possessed with a great deal of pent-up anger and frustration and that, with defendant's personality, they provide the catalyst for the propensity to commit a similar crime.

11) Defendant is described throughout the record as a follower and one who is easily influenced to do wrong. In a penitentiary setting his self image would only deteriorate further, and he would be potentially dangerous to himself and to others.

12) Both defendants demonstrated the cowardliness of their character by blaming the other for the sadistic death of Mondi Lenten even though the evidence is clear that they both were involved from the very beginning.

## STATUTORY AGGRAVATING CIRCUMSTANCES FOUND UNDER SECTION 19-2515(f) OF THE IDAHO CODE

The Court finds the following aggravating circumstances existed beyond a reasonable doubt:

1) The murder was especially heinous, atrocious, cruel and manifested exceptional depravity (5).

2) By the murder and circumstances surrounding its commission, the defendant exhibited utter disregard for human life (6).

3) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society (8).

## REASONS FOR THE DEATH PENALTY

The Court finds that the defendant actively participated in a cruel and savage slaying of a thirteen-year-old girl who had done nothing to provoke the same.

The intentional and malicious killing took from the victim what an offender can never restore—the fragile gift of life.

The defendant's actions were void of human compassion or understanding and embodied the ultimate affront to society.

A separate Court found the rape and murder by drowning of Daralyn Johnson, a nine-year-old girl, to be so heinous and atrocious as to mandate the imposition of the death penalty.

Mondi Lenten and the boys and girls who use the sidewalks and streets of our community cry out for this Court to be responsible to the will of the people and to its conscience, and to take the action that is necessary to help deter others from committing like crimes.

It is clear from the record and the facts of this case that the mitigating circumstances do not outweigh the gravity of the aggravating circumstances so as to make unjust the imposition of the death penalty. In fact, because of the gravity of the offense and the strong factors weighing against any possibility of rehabilitation, any one of the aggravating circumstances found by this Court to exist outweighs the mitigating circumstances. The defendant, by his own actions, has forfeited his right to live.

No legal cause to the contrary has been shown, and it is the judgment of this Court that the death penalty should be imposed on the defendant for the capital offense of which he was convicted.

IT IS, THEREFORE, ADJUDGED that the defendant is guilty of the crime of First Degree Murder with malice, deliberation and premeditation, and that he should be sentenced to death by the Idaho State Board of Corrections in a manner prescribed by law on April 13, 1984.

IT IS FURTHER ADJUDGED and DECREED that the defendant is guilty of Rape by verdict of the jury and should be sentenced to the Idaho State Board of Corrections for a fixed period of time of thirty (30) years.

Dated this 19th day of March, 1984.

(s) Edward J. Lodge
District Judge

## DISSENT ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice, dissenting on denial of petition for rehearing.

On the direct appeal the Court's opinion made a specific holding:

> We hold that the sentence of death imposed in the instant case is not excessive or disproportionate to the penalty imposed in similar cases.

That assessment when made was sound, and it is still sound. No one can say other than that I have agreed with it. But, as pointed out in the brief supporting the petition for rehearing, proportionality has yet to be considered by the Court with respect to the life sentence which codefendant Scroggins received.

The trial judge, the Hon. Edward Lodge, now retired from the Bench, has made public his assessment that Beam was the less culpable of the two. Law enforcement officials shared that assessment. After a thorough perusal of the record in both cases, that also became my assessment.

I remain of the opinion that it is legally unsound for the Court to not reconsider Beam's sentence in light of, at least, the views of the trial judge and the officers that Beam was less culpable than Scroggins.