Gerald Ross PIZZUTO, Jr., Petitioner–Appellant,

v.

A.J. ARAVE, Warden, Respondent–Appellee.

No. 97–99017.

United States Court of Appeals, Ninth Circuit.

Filed Oct. 20, 2004.

Joan M. Fisher, Bruce D. Livingston, Federal Public Defender, Moscow, ID, for Petitioner–Appellant.

Robert H. Gombiner, Federal Public Defender's Office Western District of Washington, Seattle, WA, Michael A. Henderson, Asst. Atty. Gen., Kenneth Robins, L. Lamont Anderson, Office of Attorney General, Boise, ID, for Respondent–Appellee.

Before B. FLETCHER, RYMER, and GOULD, Circuit Judges.

## ORDER

The dissenting opinion of Judge B. Fletcher filed February 6, 2002, and cited at 280 F.3d 949, 977 (9th Cir.2002) (slip op. at 1866), is amended as follows:

(1) The first full paragraph at slip op. 1866 is deleted.

(2) The first sentence of the second paragraph at slip op. at 1866 is deleted.

(3) The phrase "With that caveat," in the second sentence of the second paragraph at slip op. 1866 is deleted.

(4) Slip op. 1893, second paragraph, tenth line: add "(overruled on other grounds by *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002))" after *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

(5) Slip op. 1899, second full paragraph, third line: add footnote reference 15 after the word mitigating. **15** The footnote shall read as follows:

**15.** Currently before the Idaho state court is Pizzuto's petition for habeas relief based on his claim that under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), his mental retardation precludes imposition of the death penalty and execution. Pizzuto's IQ is 72. *Atkins* notes that an "IQ between 70 and 75 or lower ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309 n. 5, 122 S.Ct. 2242. The Court held that execution of such persons "is exces-

sive" under the Eighth Amendment "and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* at 321, 122 S.Ct. 2242 (citation omitted). I would stay further proceedings pending the outcome of ongoing state proceedings. The majority has denied a stay and declines even to require the parties to advise us of the status of the state proceedings.

The majority opinion has not been amended.

BETTY B. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

I concur in the results reached by the majority with respect to Pizzuto's claim of ineffective assistance of counsel on appeal, his challenge to the Idaho Supreme Court's proportionality review, and his request for an evidentiary hearing on judicial bias, the trial judge's reliance on undisclosed information at sentencing, and ineffective assistance of counsel at trial. I respectfully dissent from the majority's opinion with respect to Pizzuto's claim of ineffective assistance of counsel at sentencing, the violation of his Fifth and Sixth Amendment rights in his presentence interviews, the constitutionality of Idaho's "heinous, atrocious, or cruel" aggravating factor, and the trial court's reliance on unconstitutional, non-statutory aggravating factors.

## I.

### Ineffective Assistance at Sentencing

As the majority correctly explains, under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we must determine whether defense counsel's performance in the penalty phase of Pizzuto's trial was deficient and whether the deficiencies prejudiced the defense. For prejudice, the question is whether

there is a reasonable probability that, but for counsel's unprofessional errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Id.* at 694–95, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Notably, the Supreme Court has made clear that prejudice for ineffective assistance need not be established by a preponderance of the evidence. *Id.* ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

The majority concludes that Pizzuto has failed to satisfy this two-prong test. However, to reach this conclusion, the majority relies on unsupported rationalizations and refuses to view the deficiencies asserted by Pizzuto as a whole. In view of all the deficiencies, defense counsel's representation fell below "an objective standard of reasonableness ... under prevailing professional norms," and there is a reasonable probability that, but for their errors, Pizzuto would have been sentenced to life rather than death. *Id.* at 688, 104 S.Ct. 2052.

## A

### Failure to Challenge the State's Case in Aggravation

Under Idaho's capital sentencing law, a defendant convicted of first degree murder may not receive the death penalty unless the State establishes at least one of ten aggravating circumstances beyond a reasonable doubt. Idaho Code § 19–2515 (1984). Pizzuto's defense counsel, two attorneys wholly inexperienced in capital cases, failed to fulfill their constitutional duty to subject the State's case in aggravation to the meaningful adversarial testing that ensures a just result. *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052 ("[C]ounsel's role in [a capital sentencing] proceeding is ... to ensure that the adversarial testing process works to produce a just result.").

Evidence was readily available to cast doubt on the existence of some of the aggravating factors asserted by the State. For example, the trial judge put particular emphasis on the fact that Pizzuto tied the victims before killing them in finding that the murders were "heinous, atrocious, and cruel" and demonstrated an "utter disregard for human life."[1] Yet Rice testified that he did not see the victims tied when he went into the cabin and shot Mr. Herndon, and Odom testified that he saw them tied up only after he had divided up the money and returned to the victims' cabin to dispose of the bodies. Also, the pathologist testified that he could not determine whether the bodies had been tied before or after death.

The majority argues that other evidence was sufficient to convince the trial court that Pizzuto had tied the Herndons prior to killing them. Pizzuto's sister testified that he bragged about tying up a man and woman and shooting the man; Roger Bacon testified that Pizzuto had tied him up and robbed him; and Lt. Paul Blubaum testified that Pizzuto told him he could get anything out of anyone by tying their ankles and then beating the bottom of their feet. However, the State's circumstantial

---

1. The trial judge also noted, in his finding that the murder was heinous, atrocious, and cruel, that Pizzuto forced Mr. Herndon to drop his pants and crawl into the cabin. However, in deciding that the crimes displayed an utter disregard for human life, the trial judge's entire focus was on the fact that Pizzuto had tied the victims before killing them, so they presented "no threat to his safety or to his escape from the scene." Findings of the Idaho Dist. Ct. at 5.

evidence was not so overwhelming in light of the evidence that was available to the defense on this issue. Defense counsel might have raised a reasonable doubt in the trial judge's mind had they reminded the court of Odom, Rice, and the pathologist's testimony.[2]

Also, the State's theory that Pizzuto deserved the death penalty while his co-defendants did not depended primarily on the story told by Rice and Odom at trial. Therefore, defense counsel should have referenced the evidence from the guilt phase that showed Rice and Odom were not credible witnesses. During the guilt phase, defense counsel demonstrated that Rice and Odom had criminal records and used drugs. Defense counsel also exposed numerous inconsistencies in the stories told by Rice and Odom. They contradicted each other on many details such as the number of thumps they heard while Pizzuto was in the cabin and whether Pizzuto was wearing or carrying Mr. Herndon's boots when he emerged.

Rice and Odom gave conflicting testimony accusing each other of acts that each denied. Odom testified that prior to the murders Rice said he was going to dig graves. According to Odom, Rice tried to make him shoot Mr. Herndon in the head, and Rice complained that Mrs. Herndon was killed before he could have sex with her, which Rice denied. Odom accused Rice of taking money from Mrs. Herndon's purse, which Rice also denied. Rice, in turn, gave testimony that prior to the murders Odom suggested they jump a mining claim, kill the miner, and bury the body.

He also testified that Odom held a gun on him and that Odom bragged, "That's the way they do things here in Idaho," after the murders.

In the guilt phase, defense counsel also demonstrated that Rice had lied repeatedly to the police. At various times, Rice (1) denied any involvement in the murders, (2) admitted to hitting Mr. Herndon in the head with a hammer, and (3) admitted to shooting Mr. Herndon. In his statements to the police, Rice repeatedly said that "they" committed the murders. He conceded that his statements to the police were not true, but he could not explain why he used the word "they" when talking about who committed the murders.

Additionally, evidence not introduced at the guilt phase was available to show Rice and Odom lacked credibility. There was evidence that Odom said to an acquaintance, after the murders but before the arrests, "Where I come from, when we find a narc, we just take them out and make them dig their own grave," and that Rice's lie detector test indicated he lied when he said he had no advance knowledge of the murders.[3]

Defense counsel also possessed records showing that Lt. Blubaum, a prosecution witness, believed Odom was the least trustworthy of the three co-defendants. However, defense counsel did not bother to cross-examine Lt. Blubaum at all and failed to present available evidence that other jailers believed Odom was more dangerous than Pizzuto, was a manipulator, had no remorse for the murders, and felt he had beaten the system. Such evidence

2. The majority also asserts that tying the victims after the murders is countersensical. However, it is not apparent how Pizzuto could have tied both victims by himself if they were alive at the time and he was alone as Rice and Odom contended.

3. Polygraph evidence would have been admissible as relevant mitigating evidence for Piz-

zuto's sentencing hearing. See Rupe v. Wood, 93 F.3d 1434, 1441 (9th Cir.1996), cert. denied, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997) (reversing death sentence because trial court excluded polygraph evidence of an accomplice that was relevant to the question of what role the accomplice truly played in the crimes).

would have defused Lt. Blubaum's testimony and cast more doubt on the credibility of Odom.

The majority argues that defense counsel's failure to cross-examine Lt. Blubaum and examine the other jailers was a strategic choice. Putting the other jailers on the stand may have elicited more damaging testimony than good, but Lt. Blubaum had already given his most damaging testimony. Lt. Blubaum testified that Pizzuto had intimidated jailers, talked continually about sex and violence, and bragged about torturing people by tying up their feet and beating their swollen feet and putting snakes in mailboxes to bite people. Defense counsel's failure to cross-examine him after this testimony cannot be dismissed as a strategic choice under these circumstances.

Finally, defense counsel should have highlighted for the trial judge the difference between the Bacon robbery and the Herndon murders. Specifically, they should have noted that, when Pizzuto robbed Roger Bacon, he was alone and did not harm him. This evidence suggests that the presence of Rice and Odom was key in the murder of the Herndons and implies that the co-defendants were more involved than their testimony indicated. The majority attempts to rationalize its conclusion that Pizzuto was not prejudiced by counsel's failure to present this evidence by arguing that neither Rice nor Odom was present inside the cabin when Pizzuto struck the Herndons. The majority's argument assumes that Rice and Odom's testimony was truthful, but the point of presenting this evidence suggests that their version of the murders was not truthful.

There is no tactical reason why defense counsel would have chosen not to call the sentencing judge's attention to this evidence. *See Ainsworth v. Woodford,* 268 F.3d 868, 874 (9th Cir.2001) (finding ineffective assistance where no tactical reason could explain counsel's failure to investigate and present available mitigating evidence). The evidence was easily accessible, and it was not as if a reasonable doubt defense would have contradicted the defense's case in mitigation. The introduction of this evidence, with the exception of the testimony of the jailers other than Lt. Blubaum, would not have run the risk of opening the door to damaging rebuttal evidence that was not already before the court. *See Clabourne v. Lewis,* 64 F.3d 1373, 1385 (9th Cir.1995) (observing that defense counsel "had nothing to lose by asking the expert witnesses to testify at the sentencing hearing; their testimony would not open the door to hidden evidence of aggravating circumstances"); *cf. Burger v. Kemp,* 483 U.S. 776, 791–92, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (concluding that defense counsel made reasonable tactical choices in not presenting evidence that would open the door to damaging rebuttal); *Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987) (same), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). With a different trier of fact at the sentencing stage, defense counsel could not assume that these arguments were hopelessly foreclosed by the guilty verdict. *Cf. Felker v. Thomas,* 52 F.3d 907, 911–13 (11th Cir.1995) (finding that counsel was not ineffective for failing to resort to a "residual doubt" strategy when the sentencing jury had just found the defendant guilty), *opinion supplemented on denial of rehearing,* 62 F.3d 342 (11th Cir.1995), *cert. denied,* 516 U.S. 1133, 116 S.Ct. 956, 133 L.Ed.2d 879 (1996). For that matter, the jury never specifically found that Pizzuto was more than an accomplice to the crime.[4] There is no rea-

---

4. The jury charge permitted a finding of guilt on both murder theories if the jury found that

Pizzuto was either a principal or an accom-

sonable explanation for counsel's failure to contest the aggravating circumstances.

Furthermore, the trial judge's decision on the existence of the aggravating circumstances determined whether Pizzuto was death-eligible and what, if any, aggravating factors would weigh against the mitigating factors. Advocacy on this issue at sentencing was critical to Pizzuto's fate. Although the trial judge explained that the evidence at trial would be considered for sentencing purposes, a reasonably competent attorney would have reminded the judge of the favorable evidence, particularly when the trial was as lengthy and complicated as this one[5] and when the sentencing hearing was not conducted until nearly two months after the trial ended.

To find no prejudice, the majority cites two cases for the proposition that evidence presented in the guilt phase need not be repeated in the sentencing phase. In *Williams v. Calderon*, we held that, because mitigating evidence was presented in the course of the guilt phase, there was no prejudice when defense counsel presented no mitigating evidence during the penalty phase. 52 F.3d 1465, 1471 (9th Cir.1995). In this case, some of the evidence regarding the credibility of Rice and Odom was not presented to the court in the guilt phase, including Lt. Blubaum's reports, Rice's lie detector test, and Odom's statement about making "narcs" dig their own graves. Furthermore, *Williams* is distinguishable. In *Williams*, the court was reviewing a California trial in which a jury decided whether aggravating circumstances existed. *Id.* at 1468. Normally a jury will sit through a sentencing hearing almost immediately after conviction, but, in Pizzuto's case, the judge did not hold the sentencing hearing until almost two

months after the conviction. The judge may well not have remembered the numerous details of the trial two months later or carefully sifted through the lengthy trial transcript before sentencing.

The majority also cites *Woratzeck v. Stewart*, which found that there was no prejudice when defense counsel failed to present evidence that was available in the presentence report. 97 F.3d 329, 336–37 (9th Cir.1996). A presentence report is a discrete document prepared for the court specifically for sentencing. As such, a presentence report contrasts sharply with thousands of pages of trial transcript from a trial held two months earlier. Defense counsel's failure to present evidence from the previous trial is much more likely to affect the outcome of the sentencing phase.

Because so much time passed between the conviction and the sentencing, and this evidence was substantial enough that it reasonably could have altered the balance between the mitigating and aggravating circumstances, there does seem to be a reasonable probability that, but for defense counsel's failure to reargue the favorable evidence from trial, the judge would have sentenced Pizzuto to life rather than death. Also, considered cumulatively with counsel's other deficiencies discussed below, defense counsel's failure to contest the State's case in aggravation was prejudicial. *See Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir.1995) (holding that the cumulative impact of multiple deficiencies in defense counsel's performance prejudiced the defendant in a capital trial). Taking into account the deficiencies in the case in mitigation, the fact that the evidence available to challenge the state's case in aggravation would not have under-

---

plice. The jury convicted without specifying whether it found Pizzuto to have been an accomplice or a principal.

**5.** Pizzuto's trial lasted thirteen days, over the course of which over twenty witnesses gave testimony.

mined the double-murder aggravating circumstance does not preclude a finding of prejudice. It is necessary to re-weigh any remaining aggravating circumstance against the mitigating evidence that should have been presented.

## B

### Failure to Investigate, Argue, or Present Mitigating Evidence

Defense counsel had a duty to investigate, introduce, and explain the significance of available mitigating evidence absent tactical reasons for avoiding such evidence. *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir.2001) (en banc) ("To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' "). While defense counsel presented evidence of Pizzuto's horrific childhood abuse, defense counsel was unconstitutionally deficient in failing to present other available evidence in mitigation. Specifically, defense counsel did not argue the relative culpability of the co-defendants and did not properly investigate Pizzuto's mental health.

*Relative Culpability of Co–Defendants:* The relative culpability of co-defendants is a well-recognized mitigating circumstance. *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir.1996); *Mak v. Blodgett*, 970 F.2d 614, 622–23 (9th Cir.1992), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993). However, defense counsel did not argue the relative culpability of Rice and Odom at sentencing, thus conceding that Pizzuto was the principal of these murders and the most culpable of the three co-defendants. This aspect of defense counsel's ineffectiveness is the same as that discussed above, but from the perspective of mitigation: defense counsel failed to introduce any of the ample evidence that Rice and Odom were not credible witnesses and that they likely were more culpable, and Pizzuto less culpable, than their testimony indicated. As noted above, the jury did not find that Pizzuto was more than an accomplice, and, thus, there certainly was room to argue that he was not actually the principal in these murders. In the end, the trial judge adopted the State's version of the murders based on the testimony of Odom and Rice that Pizzuto was the actual and sole killer, acknowledging Rice and Odom only as Pizzuto's "associates."

As discussed above, defense counsel's failure here cannot be attributed to a reasonable strategic choice. Thus, in this regard, defense counsel's representation "fell below an objective standard of reasonableness ... under prevailing professional norms." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Once again, although the great bulk of the evidence on Rice and Odom's credibility was presented and argued before the trial judge during the guilt phase, the complexity of the case and the time lapse between the conviction and the penalty hearing support a finding of prejudice, especially in light of the trial judge's explicit adoption of the State's version of the murders. *Cf. Williams*, 52 F.3d at 1471. In addition, this deficiency certainly contributes to the overall prejudice caused by all of defense counsel's errors in the penalty phase, as explained in greater detail below.

*Mental Health Investigation:* Defense counsel also was unconstitutionally deficient in failing to request from the court and to consult with an independent psychological expert and in failing to provide the court's mental health expert with the information necessary to make a complete diagnosis. Any contention that a request for an independent expert was made is belied by the record. Although the trial

judge referred to a letter dated April 14, 1986, in which defense counsel allegedly requested that they be permitted to hire Dr. Emery to examine Pizzuto for sentencing, this letter is no where in the record, and the letter does not reflect that defense counsel requested an independent expert, only that they requested an expert. Dr. Emery was not an independent expert because he was ordered to report directly to the court.

There simply is no evidence in the record that Pizzuto's defense counsel either objected to the court's order that the expert report directly to the court or insisted on hiring an independent expert. In the absence of such evidence in the record, it is inappropriate to assume that these actions were taken. The majority contends that we may make this assumption, however, because Pizzuto asserted in his petition for rehearing to the Idaho Supreme Court that his defense counsel had requested independent defense experts.[6] What the majority fails to acknowledge is that Pizzuto's defense counsel continued to represent him during these proceedings, although one of his current attorneys also appeared on his behalf on the 1991 brief. The petitioner should not be estopped from arguing that his defense counsel failed to request an independent expert. The record simply does not support the assertion that such a request was made, and Pizzuto should not be penalized for his defense counsel's failure to acknowledge his deficient representation of Pizzuto at sentencing.

According to the record, defense counsel did not request or consult an independent mental health expert despite the fact that defense counsel was aware that the trial judge considered Pizzuto's mental condition to be a "significant factor" for sentencing. In the end, the only mental health expert utilized by the defense for sentencing was Dr. Emery, the doctor chosen to report to the court.

Dr. Emery's report responded to the questions asked by the court and was furnished directly to the court. The court forwarded copies to the prosecutor and defense counsel. Dr. Emery interviewed Pizzuto for a total of 2.75 hours. His testimony was based on his interview with Pizzuto, interviews of two of Pizzuto's relatives done only the night before he testified, Pizzuto's arrest record, and the defense's case in mitigation and the State's case in aggravation, which he observed prior to testifying.

Dr. Emery testified for both the defense and the prosecution. The court also questioned Dr. Emery. Dr. Emery testified that Pizzuto has an antisocial personality disorder characterized by a preoccupation with justifying himself, a preoccupation with violence, and difficulty anticipating the consequences of his behavior. He testified that Pizzuto is explosive, impulsive, lacks empathy, has little tolerance for ambiguity, and would likely prey on those weaker than he in prison. He also testified that the terrible physical, emotional, and sexual abuse suffered by Pizzuto could be responsible for his antisocial personality disorder. He opined that Pizzuto's upbringing had "the highest odds to having an offspring that is going to behave in a violent manner," and that neither medication nor therapy would likely help Pizzuto.

Defense counsel acted unreasonably in relying solely on Dr. Emery's evaluation of Pizzuto's mental health. Defense counsel should have consulted an independent psychiatrist who did not report to the court or the prosecutor and with whom the lawyer

---

**6.** The language used in the brief was as follows: "[T]hough requested by the defense both pre-trial and pre-sentence, not a single independent defense expert was provided." Appellant's 1991 Brief in Support of Pet. for Rehrg. to Idaho S.Ct. at 11–12.

and the client could discuss matters in confidence. Before Pizzuto's trial began, the Supreme Court held, in *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), that an indigent capital defendant has a right to a psychiatric expert to "assist in the evaluation, preparation, and presentation of the defense" when the defendant's mental condition is significant to the proceeding. In *Smith v. McCormick*, 914 F.2d 1153, 1157 (9th Cir. 1990), we noted that *Ake* rejected the notion that there is such a thing as "neutral" psychiatric testimony, further supporting *Ake's* holding that an indigent capital defendant is entitled to his own psychiatric expert. The *Smith* court concluded that the court's neutral psychiatrist "in no sense assisted in the evaluation or preparation of the defense." *Id.* at 1158.

Although *Smith* was not decided until after Pizzuto's sentencing, the result was already dictated by *Ake*. In addition, the petitioner submits the affidavit of Kathryn Ross, who is qualified as an expert to testify on issues of constitutionally adequate death penalty representation. Ross states that, at the time of Pizzuto's trial, constitutionally effective counsel in a capital case would have been required to request an independent mental health expert if they had reason to believe the client's mental condition might be at issue.[7] In this case, the trial judge made clear that he considered Pizzuto's mental condition to be a significant factor for sentencing. The State has not presented any evidence to rebut Ross's statement. This affidavit, along with the authority of *Ake*, make out, at a minimum, a colorable claim that defense counsel's failure to consult an independent mental health expert was unconstitutionally deficient. Defense counsel was ineffective in relying on Dr. Emery also because Dr. Emery's examination of Pizzuto was short and incomplete, and he lacked important information that would have influenced his opinion.

Defense counsel, although aware of this information, did not inform Dr. Emery that Pizzuto experienced seizures or that he was taking anti-seizure medication, and they did not provide him with Pizzuto's prison records, which indicated that Pizzuto had epilepsy and that his behavior improved over the course of his incarceration. Pizzuto sustained serious head injuries from falling down a flight of stairs at the age of two and from a bicycle accident when he was a teenager. Dr. Emery's affidavit indicates that he was not aware of Pizzuto's seizures or head injuries.

We have held that an attorney has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request ..., at least at the sentencing phase of a capital case." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir.1999).[8] This conclusion is

---

7. The majority suggests that this affidavit can be ignored because it does not purport to be based on a review of the record in this case or to express an opinion on defense counsel in this case. It is not clear why that would be necessary when Ross stated that any competent defense attorney, without exception, would have retained an independent mental health expert under the exact circumstances present in this case, that is, when the defendant's mental condition is a significant factor and his life is at stake. There is no valid reason to ignore this evidence.

8. This court held in *Murtishaw v. Woodford* that defense counsel is not ineffective for failing to provide a mental health expert with unrequested background information about the defendant for the guilt phase of trial. 255 F.3d 926, 945 (9th Cir.2001). However, the court specifically distinguished existing precedent that held that, to be effective *in the penalty phase* of a capital case, defense counsel must provide background information to mental health experts who are examining the client, even if the experts do not request those facts. *Id.* at 945, n. 9 (citing *Caro v. Calderon*, 165 F.3d 1223 (9th Cir.1999)). The *Murtish-*

based on the idea that "[a] lawyer who knows of but does not inform his expert witnesses about ... essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment." *Id.* at 1117 (quoting *Caro v. Calderon,* 165 F.3d 1223, 1228 (9th Cir.1999)). In *Wallace,* defense counsel was unconstitutionally deficient in failing to provide the mental health expert with the defendant's psychological profiling results and in not informing the expert of the defendant's chaotic family history, including a "clinically significant series of head traumas." *Id.* at 1116. As a result, the experts who testified both for and against the defendant agreed that their diagnoses were incomplete, and that they failed to discover that the defendant likely suffered from organic brain damage.

Similarly, Dr. Emery admits in his affidavit that the omitted facts regarding Pizzuto were significant for the purposes of a complete mental health evaluation and would have caused him to recommend neuropsychological testing prior to trial and sentencing. He states in his affidavit that, "in light of Pizzuto's apparent seizures and abused childhood, which reportedly includes blows to the head," a neuropsychological examination of Pizzuto would have resulted "in a more thorough and complete assessment of Pizzuto's psychological makeup." Emery Affidavit at 2. Dr. Emery asserts in his affidavit that the evidence indicates that Pizzuto may have temporal lobe seizures, and a neuropsychological examination would have been helpful in detecting such organic brain damage. Pizzuto also submits the affidavit of Dr. Craig Beaver, who was employed after sentencing. Dr. Beaver conducted a more thorough examination of Pizzuto, including

8.5 hours of interviews with Pizzuto, a review of an affidavit of Pizzuto's mother describing his head injuries, a comprehensive neuropsychometric examination, and a review of Pizzuto's prison records. Dr. Beaver's neuropsychometric examination of Pizzuto revealed significant neurocognitive defects consistent with brain injury and seizure disorder.

The findings of Dr. Sarah Werner, who examined Pizzuto on one occasion after he suffered a seizure while in the Idaho penitentiary, do not justify defense counsel's failure to insist on a neuropsychological examination of Pizzuto. The respondent submitted Dr. Werner's affidavit in response to Pizzuto's petition in state court for post-conviction relief. In her affidavit of May 8, 1987, she states that "the probability that Pizzuto is suffering from temporal lobe organic disorder is exceedingly low given the results of the examinations and tests I performed on him."

However, Dr. Werner's opinion of Pizzuto's condition was not stated so clearly in the medical records she wrote when she examined Pizzuto. Admitting that it was "almost impossible to extract an adequate history from this patient," she wrote:

> The history given ... certainly [is] consistent with a temporal lobe origin seizure and *it is likely that the patient has had these in the past.* The episodes that he *currently presents* ... could represent temporal lobe status, however the variability and the unusually rapid clearing once out of medical observation and additionally the timing of his symptomatology all strongly suggest that this is a pseudoseizure.

Post–Conviction Relief Record at 47 (emphasis added). At that time, she recom-

---

aw court emphasized, "In this case, Murtishaw does not argue that his experts during the penalty retrial were deprived of potentially relevant information." *Id.* By contrast, here

Pizzuto argues that his experts were deprived of relevant information during the penalty phase.

mended that he continue to take anti-seizure medication.

Dr. Werner's statements in the medical records differ markedly from her statement submitted for post-conviction relief purposes. Instead of justifying no further investigation, her statement in the medical records should have alerted defense counsel to the possibility of a temporal lobe disorder that could have provided mitigating evidence for sentencing.[9] There is no suggestion that defense counsel contacted Dr. Werner for further explanation or conducted any investigation into these facts at all. Neither could defense counsel have relied on the fact that Dr. Emery did not find a need for neurological examinations because, as discussed above, they failed to give him the information necessary to form an opinion in this regard.

In sum, defense counsel's failure to insist on neuropsychological testing did not stem from an informed decision made after reasonable investigation, as required by the Constitution, but was the product of neglect. *See Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir.1998) (finding ineffective assistance where defense counsel "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision" regarding his client's mental health defenses); *cf. Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir.1995) (holding that defense counsel gathered sufficient evidence to make a reasonable tactical decision not to conduct further investigations into his client's mental health when psychiatric experts interviewed the defendant for more than twenty hours and informed defense counsel that they could not find any basis for a mental defense).

Pizzuto not only has shown that his counsel's failure to investigate and secure mental health evidence constituted an un-

constitutional deficiency, he has also shown that the deficiency prejudiced his capacity to present relevant and compelling mitigation evidence and to counter the State's evidence of aggravation. The bulk of Dr. Emery's testimony led the trial court to find numerous aggravating circumstances, not mitigating circumstances, including the fact that Pizzuto has a low I.Q. At least twelve of the non-statutory aggravating factors listed in the court's findings are based directly on Dr. Emery's testimony at sentencing, often using his exact words.

By relying on an expert who reported directly to the court and the prosecutor and who lacked critical information about Pizzuto's history, the defense left the trial court with only Dr. Emery's negative conclusions. Had defense counsel consulted an independent expert whom he fully informed and who conducted a more comprehensive examination, the expert probably would have provided testimony similar to that contained in Dr. Beaver's affidavit.

The majority finds little difference between Dr. Beaver's affidavit and Dr. Emery's testimony at the sentencing hearing. I disagree. It is true that the doctors' statements do not directly contradict each other in every regard; after all, they were evaluating the same person. However, Dr. Beaver contributed important mitigating factors that Dr. Emery's testimony did not reach.

Dr. Emery characterized Pizzuto simply as a sociopath; he testified that Pizzuto likes to dominate others, that medications and therapy would not likely help Pizzuto, and that Pizzuto will continue to be dangerous even in prison. The judge, in questioning Dr. Emery, focused on these particular aspects of the doctor's opinion.

9. No one questions that Pizzuto had the requisite mental state for a conviction of murder in the first degree. However, the evidence of epilepsy and brain damage is important evidence in mitigation for the purpose of individualized sentencing.

Dr. Beaver's affidavit, in contrast, states that "[w]hile Pizzuto does have some anti-social traits, he also struggles with an organic mental syndrome, related to his epilepsy." He explains that Pizzuto exhibits passive dependent features, which, combined with his cognitive and emotional limitations, "make it very unlikely that [he] would be a leader with a group of peers." Dr. Beaver gives us a better understanding of the impact the childhood abuse had on Pizzuto, explaining that patients with brain damage and/or epilepsy are "more vulnerable to their environment and are more adversely affected by negative family and environmental conditions given their more limited resources." This description of his mental condition paints a very different picture of the human being before the court. These are the kind of "compassionate or mitigating factors stemming from the diverse frailties of humankind that the court must not be precluded from considering in the individualized sentencing required in capital cases". *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

Dr. Beaver also stated: "I do *not* feel Jerry Pizzuto poses a significant risk to others within the prison population. If Pizzuto continues on anti-seizure medication, has the structure of the correctional system, and remains abstinent from drugs or alcohol, I believe he can function safely and adjust appropriately to long-term incarceration." Beaver Affidavit at 8 (emphasis in original). In contrast, Dr. Emery testified that Pizzuto might be safe and productive only in a highly structured setting where supervision would prevent any sort of predator-prey relationship. Upon questioning from the court, he went on to say that the penitentiary system is highly hierarchical, implying that there was not sufficient supervision to prevent Pizzuto from posing a danger to others. His conclusion as to the danger Pizzuto posed in prison was very different from Dr. Beaver's.[10]

As can be seen from this review of the evidence, the epilepsy and possible brain damage suffered by Pizzuto are extremely important in understanding his behavior, in assessing his culpability, and in determining whether medication would be helpful. By failing to request an independent expert and not giving the court's expert pertinent information, defense counsel lost the opportunity to share this understanding with the court in aid of presenting mitigation. Instead, the court heard overwhelmingly aggravating circumstances that contributed directly to the court's decision to impose the death penalty. This important mental health evidence alters the balance of mitigating and aggravating circumstances and its absence at sentencing significantly undermines confidence in the outcome.

## C

### Closing Argument

In addition to defense counsels' failures during the rest of the sentencing hearing,

---

**10.** The majority takes Dr. Beaver's statement that he does not believe Pizzuto poses a significant risk to others in prison out of context to conclude that he agrees with Dr. Emery that Pizzuto poses some risk. However, as the State conceded at oral argument, no doctor would presume to conclude that a prisoner poses no risk at all. They can only speak in terms of probabilities, and Dr. Beaver's assessment of that probability is significantly different from Dr. Emery's.

The majority also suggests that Dr. Beaver's statement is not probative of how Pizzuto would have been assessed by a fully informed, independent mental health expert at the time of trial. Dr. Beaver did not evaluate Pizzuto until 1996, when Pizzuto had reached the age of 40. However, this delay was the direct result of defense counsel's ineffectiveness in failing to obtain and fully inform an independent expert at the time of trial. It cannot be held against Pizzuto at this stage.

defense counsel's brief closing argument was unconstitutionally deficient. The State's closing argument outlined the facts of the crime as the State viewed them, reviewed the testimony of the witnesses in aggravation, emphasized Dr. Emery's conclusion that Pizzuto was dangerous and could not be rehabilitated, referred to the suffering of the surviving family members, and asked for the death penalty. Defense counsel gave a brief closing argument. Other than general pleas for mercy and forgiveness, the defense's closing, reported on three pages, consisted of the following:

> Regardless of the verdict of this jury, does there not linger in your mind some doubt as to the roles of these people in this grizzly event that took place in Ruby Meadows? Is there nothing salvageable about this human being that we can look to after hearing Emery's testimony, that this man is the classic case of sociopath, abusing children? And if you could pick a scenario to point out the worst of all childhood experiences, Jerry Pizzuto would be the man who most demonstrates that. Cannot there be some thought of forgiveness for that and all of the suffering that he has taken upon his shoulders throughout his childhood and his life? ... He's a victim of the system, he's a victim of his parents, and of course he's a victim of himself.

Defense counsel's closing argument was devoid of substance. He did remind the court of Dr. Emery's testimony that Pizzuto was a classic sociopath! He did not bother to challenge the State. He had at hand available evidence to challenge whether the aggravating circumstances had been proved beyond a reasonable doubt. Instead of summarizing and explaining the impact of the multitude of evidence available showing the lack of credibility and relative culpability of the co-defendants, defense counsel merely suggested that there might be "some doubt" lingering as to the roles of "these people." These omissions highlight his professional incompetence. See Mayfield, 270 F.3d at 928 (finding counsel's "perfunctory" closing deficient in its failure to explain the significance of the mitigating evidence). Worse than omitting important evidence, this "lingering doubt" statement assumed that the jury had decided Pizzuto was the actual killer, and that Rice and Odom were not culpable, despite the general verdict that may have been based on an accomplice theory.

At the beginning of his closing, defense counsel said, "I don't think that a long attempted eloquence will make any difference in this matter, so I'm not going to belabor this court with my conversation." The State claims that this was an acknowledgment of defense counsel's tactical choice to keep the closing short. However, if this was a tactical choice, it was not a reasonable one. Possibly if defense counsel had presented, during the sentencing hearing, the available evidence casting doubt on the aggravating circumstances and showing mitigating circumstances, he could have refrained from extensive rehashing of evidence. But defense counsel failed, during the hearing, to contest the aggravating factors, argue the unreliability of the prosecution's key witnesses and their relative culpability, and discover and present important mental health evidence. In assessing ineffectiveness claims it "is the totality of [defense counsel's] efforts we must examine, not just part of them in isolation." Gerlaugh v. Stewart, 129 F.3d 1027, 1036 (9th Cir.1997). In the context of an already deficient representation at sentencing, defense counsels' failure to make such arguments at closing left the trial court with little reason to spare Pizzuto's life. In light of the prosecution's detailed and thorough closing, counsel's performance was devastating.

1260

Also, this is not the sort of case where the evidence of the aggravating circumstances was so overwhelming that arguing the mitigating evidence available to the defense or arguing that some of the aggravating circumstances were not established beyond a reasonable doubt would have been "a useless charade." *Id.* at 1043. On this point, our decision in *Smith v. Stewart* is telling. 140 F.3d 1263 (9th Cir.1998). Like the Herndon murders, Smith was convicted of a robbery murder. The underlying crime in *Smith* was roughly similar to this case. Smith was a parolee who committed several armed robberies before shooting a store clerk in cold blood. *Id.* at 1268. Smith's victim died after he "lingered on in pain and fear for a couple of weeks." *Id.* at 1269. Smith offered a "cock-and-bull story" upon his arrest. When he discovered that his story would not hold up, he devised a new defense that the jury did not credit. *Id.* at 1268.

Smith's lawyer failed to investigate or present any mitigating evidence, despite the availability of evidence that Smith had an antisocial personality disorder, a bad drug history, and some close family relationships. *Id.* at 1269. Although this court recognized that these mitigating factors were often treated on appeal as insufficient to justify mitigation, the court could think of no tactical reason for not presenting or at least arguing this evidence. *Id.* Significantly, the court stated, "[W]hile the facts of this case are bad enough to disturb even a jaded observer, they do not reach the level of those in cases where the aggravating facts were so overwhelmingly horrifying that it was highly improbable that mitigating factors of any ordinary stripe would help." *Id.* at 1271. The *Smith* court determined that "the failure to even attempt to persuade the sentencing judge, through evidence or argument, that he should grant Smith leniency" was ineffective. *Id.* at 1269. Equally in Pizzuto's case, the facts were not so extreme that

there was no hope for mitigating them such that defense counsels' abandonment of the available evidence was reasonably justified. *See also Mayfield,* 270 F.3d at 929 (holding that Mayfield was prejudiced by his defense counsel's failure to present all the available mitigating evidence although "[t]he aggravating evidence against Mayfield was strong" and "[t]he mitigation evidence presented ... was substantial").

Further, Pizzuto has demonstrated that defense counsels' deficient closing contributed to the cumulative prejudice caused by the other errors at sentencing. Under prevailing case law, individual deficiencies in representation which may not by themselves meet the *Strickland* standard may, when considered cumulatively, constitute sufficient prejudice to justify issuing the writ. *See Harris,* 64 F.3d at 1438–39 (holding that the cumulative impact of multiple deficiencies in defense counsel's performance prejudiced the defendant in a capital trial); *Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death.").

To judge cumulative prejudice, we must look at each deficiency in light of the other deficiencies. Since counsel did not present trial evidence in the sentencing hearing, it was unreasonable not to make more explicit reference to the evidence from trial in the closing argument to at least remind the judge that the trial record deserved a closer look for his sentencing determination. Inversely, had defense counsel included specific references to the trial evidence in the closing argument for sentencing, it may have been more reasonable to omit it from the presentation of evidence during the sentencing hearing.

The district court's finding of no prejudice denigrates the importance of advocacy. It assumes that because the trial court heard the testimony at trial, counsel's complete failure to address the evidence at sentencing did not matter. However, the Supreme Court itself, in deciding that defense counsel must be allowed to make a closing argument in a bench trial, recognized that even a two-day interval between evidence and decision might create a situation in which "the judge's memory may well have dimmed, however conscientious a note taker he may have been." *Herring v. New York*, 422 U.S. 853, 864, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). As noted previously, Pizzuto's sentencing hearing occurred nearly two months after the thirteen-day trial.

Finally, the evidence that Pizzuto's defense counsel failed to reargue in the hearing and at closing was significant. It called into question the relative role that Pizzuto played in these murders and the sequence of events that took place during the murders. These factors were significant in the determination of whether the murders were "heinous, atrocious, and cruel" and whether they exhibited "an utter disregard for human life." This evidence reasonably could have cast enough doubt on the State's version of the murders to tip the balance of the scales in favor of mitigation. A new balance is particularly likely because the trial court was not offered a complete picture of Pizzuto's mental health, which would have revealed more circumstances in mitigation. As a result, defense counsels' overall deficient performance undermines confidence in the outcome of the sentencing.

## D

### Evidentiary Hearing

Based on the state court record and the affidavits submitted by Pizzuto, he has raised a colorable claim of ineffective assistance of counsel at sentencing. No court has held an evidentiary hearing on Pizzuto's ineffective assistance claims. In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court. *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir.1994). Pizzuto is entitled to an evidentiary hearing on this claim.

We have previously emphasized the importance of evidentiary hearings in capital habeas proceedings. In *Siripongs*, after remanding the case for an evidentiary hearing on the claims of ineffectiveness and receiving the results, the court observed that its decision could now be "made with the confidence that must accompany a decision that upholds a sentence of death." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir.1998). The court explained that often such confidence can only be gained after the petitioner has the opportunity to develop the factual record. *Id.*

Our recent decision in *Hoffman v. Arave* supports the need for an evidentiary hearing on the issue of prejudice in particular. 236 F.3d 523 (9th Cir.2001), *cert. denied, Arave v. Hoffman*, 534 U.S. 944, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001). As in Pizzuto's case, no state or federal court had conducted a hearing on Hoffman's allegations of ineffective assistance. In *Hoffman*, the court stated:

Without the benefit of an evidentiary hearing, it is impossible to evaluate the strength of Hoffman's defense at trial and sentencing. Therefore, we cannot conclude as a matter of law that there is no reasonable possibility that offering expert testimony and a thorough history of Hoffman's educational, medical, and psychological problems at the time of

the murder might have reduced the likelihood that the death penalty would have been imposed. *Id.* at 536. Consequently, the court ordered the district court to hold an evidentiary hearing. *Id.* Also, in *Wallace*, 184 F.3d at 1118, where the defendant alleged ineffective assistance because his counsel did not furnish his mental health experts with pertinent facts, we found that an evidentiary hearing was required to develop the factual record needed to assess prejudice. Thus, a determination that Pizzuto has not established prejudice is premature on this record. I would remand for an evidentiary hearing.

## II.

## Fifth and Sixth Amendment Rights in Presentence Interviews

Pizzuto's Fifth and Sixth Amendment rights were violated because the trial court used uncounselled, non-Mirandized statements from the presentence interviews against him at sentencing.[11] *Hoffman*, 236 F.3d at 538, 540. I disagree with the majority's conclusion that these constitutional violations were "harmless errors."

In *Hoffman*, after deciding that Hoffman's Sixth Amendment right had been violated by the use of uncounselled statements made in a presentence interview, we remanded the question of whether the violation constituted harmless error. *Id.* at 541. We could not "adequately evaluate the impact of Hoffman's incriminating statements made during the presentence interview without considering the full body of mitigating and aggravating evidence considered at sentencing. Hoffman's allegations of ineffective assistance of counsel at the trial cast doubt over the reliability of this body of evidence." *Id.* at 540–41.

A hearing on ineffectiveness was necessary to determine whether the Sixth Amendment violations were harmless despite the fact that Hoffman took the witness stand during the sentencing hearing and related to the trial court virtually the same information which he disclosed during the presentence interview. *Hoffman v. Arave*, 73 F.Supp.2d 1192, 1205–06 (D.Idaho 1998). Like Hoffman's statements, many of the statements made by Pizzuto in the presentence interviews were introduced to the trial court through other evidence or did not appear to significantly impact the trial judge's decision to impose the death penalty. But, also, like Hoffman, Pizzuto has presented colorable claims of ineffective assistance of counsel at sentencing that require an evidentiary hearing.

Pizzuto's claims of ineffectiveness are similar to Hoffman's. Hoffman's trial counsel apparently failed to obtain or review their client's educational, medical, or psychological records, failed to request a psychiatric evaluation of their client until after the trial despite awareness of his illiteracy, low intelligence, and psychological problems, and failed to follow up on the conclusion of a doctor that Hoffman suffered from possible brain damage. Simi-

---

11. The use of both the Idaho and Michigan presentence interviews at Pizzuto's 1986 capital sentencing was a constitutional violation under *Hoffman*. As held in *Hoffman*, 236 F.3d at 537, the application of this rule to these interviews is not *Teague* barred; it is not a new rule because the rule was dictated by *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). We decided in *Baumann v. United States*, 692 F.2d 565, 577 (9th Cir.1982), only that the use, *in a non-capital* case, of uncounselled statements made in a presentence interview does not violate the Sixth Amendment. Although the Michigan presentence interview was conducted for a non-capital case, using statements from that interview in Pizzuto's capital sentencing brings it firmly within the purview of *Estelle* and *Hoffman*. I would note that the majority's language to the contrary with respect to the Michigan presentence interview is merely dicta.

larly, Pizzuto claims that his trial counsel failed to investigate or present important mitigating evidence, including possible brain damage, an error that was further exacerbated by the fact that his trial counsel did not attempt to challenge the State's case in aggravation with readily available evidence. Because of these claims, the body of mitigating and aggravating evidence is not reliable in Pizzuto's case. Therefore, as in *Hoffman*, the "harmless error" analysis on his Fifth and Sixth Amendment claims should be remanded to await the evidentiary hearing on the ineffectiveness claim.

## III.

## Constitutionality of Idaho's "Heinous, Atrocious, or Cruel" Aggravating Factor

Idaho's list of statutory aggravating circumstances, at least one of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed, includes a finding that "[t]he murder was especially heinous, atrocious or cruel, manifesting exceptional depravity." The trial judge in Pizzuto's case found that this factor, along with four others, existed beyond a reasonable doubt.[12] The petitioner asserts that this aggravating factor is unconstitutionally vague.

The Supreme Court has held that the state must "channel a [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and 'make rationally reviewable the process for imposing a death sentence.' " *Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)).

If the statutory language is too vague, then the federal court must determine whether the state courts have further defined the vague terms in a constitutionally sufficient manner. *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)). The parties agree that the terms "heinous, atrocious, and cruel" and "manifesting exceptional depravity" are too vague to sufficiently guide the sentencer. *Maynard v. Cartwright*, 486 U.S. 356, 360, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (holding that "heinous, atrocious, or cruel" is unconstitutionally vague language); *Godfrey*, 446 U.S. at 420–21, 100 S.Ct. 1759 (holding "depravity of mind" to be unconstitutionally vague language); *Moore v. Clarke*, 904 F.2d 1226, 1230 (8th Cir.1990) (holding that "exceptional depravity" is unconstitutionally vague).

The issue in contention is whether the Idaho Supreme Court has provided a limiting construction to guide the sentencer's discretion in a constitutionally sufficient manner. The State argues that the Idaho Supreme Court sufficiently limited the Heinous, Atrocious or Cruel ("HAC") factor by adopting the following interpretation of "exceptional depravity" from Nebraska:

> In interpreting this portion of the statute, the key word is "exceptional." It might be argued that every murder involves depravity. The use of the word "exceptional," however, confines it only to those situations where depravity is apparent to such an extent as to obvi-

---

**12.** The five aggravating factors found by the trial judge were: (1) the crime was a double murder, (2) the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity, (3) by the murder, the defendant exhibited an utter disregard for human life, (4) the murder was committed in the perpetration of a robbery and the defendant intended a killing, and (5) the defendant has exhibited a propensity to commit murder.

ously offend all standards of morality and intelligence.

*State v. Osborn*, 102 Idaho 405, 631 P.2d 187, 200 (1981) (quoting *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881, 891 (1977)), *cert. denied*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, *reh'g denied*, 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977). However, the Eighth Circuit has held that Nebraska's use of the word "exceptional" does not provide sufficient guidance. *Moore*, 904 F.2d at 1230–31. It reasoned that "exceptional" is just as subjective and vague as "especially," a term the Supreme Court has rejected as unhelpful in guiding the sentencer. *Id.* at 1230 (citing *Maynard*, 486 U.S. at 364, 108 S.Ct. 1853). This reasoning is persuasive.

The respondent also argues that the Idaho Supreme Court has constitutionally limited the HAC factor by adopting the following interpretation of "heinous, atrocious, or cruel" from the Florida Supreme Court:

> What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—**the conscienceless and pitiless crime which is unnecessarily torturous to the victim.**

*Osborn*, 631 P.2d at 200 (emphasis added) (quoting *State v. Dixon*, 283 So.2d 1, 9 (Fla.1973)), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The Supreme Court approved of this limiting construction in *Sochor v. Florida*, 504 U.S. 527, 536, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), "understanding the factor, as defined by the Florida Supreme Court, to apply only to a 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.'"

However, Pizzuto contends that the Idaho Supreme Court, in the cases decided after the adoption of this limiting construction, did not specifically find that the HAC homicides were unnecessarily torturous, and the court's formulation of the limiting standard has not been consistent. The Supreme Court addressed a similar claim in *Proffitt v. Florida*, 428 U.S. 242, 255 n. 12, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). The Court reviewed the Florida cases that used the HAC factor after the new construction was adopted. *Id.* The Court found that the circumstances of all of these cases could accurately be characterized as "pitiless" and "unnecessarily torturous," and concluded that the state court had not abandoned the definition it had announced. *Id.*

It is necessary to undertake this same type of review with regard to the Idaho Supreme Court's treatment of the HAC factor since the adoption of the "unnecessarily torturous" language.[13] Of the seventeen Idaho Supreme Court cases using the HAC factor, possibly five (nearly one-third) involved no suffering on the part of the victim. The murder in *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990), was not "unnecessarily torturous" because the de-

---

**13.** The State contends that this type of review is foreclosed by *Arave v. Creech*, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). In *Creech*, the Supreme Court held that its decisions "do not authorize review of state court cases to determine whether a limiting construction has been applied consistently." *Id.* at 1544. However, the Supreme Court made it explicit that "federal courts may consider state court formulations of a limiting construction to ensure that they are consistent," approving the analysis undertaken in *Proffitt*. *Id.* I do not propose to review whether the limiting construction has been applied consistently, which would involve a comparative analysis of the cases and amount to a proportionality review, as noted in *Walton*, 497 U.S. at 655–56, 110 S.Ct. 3047 (1990). Instead, in line with *Proffitt*, the review I propose looks merely to see whether Idaho's formulation, requiring unnecessary torture, has been consistent.

fendant shot his victim with a semi-automatic weapon at close range. In two other cases, the facts of the crime, as recounted by the court, do not suggest that the victims did not die immediately. *See State v. Lankford,* 116 Idaho 860, 781 P.2d 197 (1989) (the defendant hit his victims on the head with a night stick); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984) (the defendant hit his eight-month-old victim with severe force). In another two cases, the supreme court did not provide detailed facts of the crime, and, thus, it is not possible to discern whether they support a finding of "unnecessary torture." *See State v. Rhoades,* 121 Idaho 63, 822 P.2d 960 (1991); *State v. Fain,* 116 Idaho 82, 774 P.2d 252 (1989) (no specific finding of torture or specific facts supporting a finding of torture were included in the opinion in either case). In sum, on the facts deemed critical by the Idaho Supreme Court, only twelve of Idaho's seventeen "heinous, atrocious, or cruel" murders involved torture to the victim,[14] and five did not. This record is in stark contrast to the Florida Supreme Court's record reviewed by the Supreme Court in *Proffitt.* In *Proffitt,* the Supreme Court found that the circumstances of all of the Florida cases could have been accurately characterized as "pitiless" and "unnecessarily torturous." *Proffitt,* 428 U.S. at 255 n. 12.

Given this shaky record and the Idaho Supreme Court's repeated failure to specifically require that the "unnecessarily torturous" standard be met, particularly at the time of Pizzuto's state proceedings, Idaho's interpretation of the HAC factor did not provide sufficient guidance to the sentencer. Thus, this factor remained unconstitutionally vague when Pizzuto's sentence was imposed.

---

**14.** *State v. McKnight,* 135 Idaho 440, 19 P.3d 64 (2000) (upholding, in a non-capital case, the trial court's finding that the murder was "heinous, atrocious, or cruel" because the defendant beat his victim repeatedly with a golf club, causing profuse bleeding, continued to beat the victim with a second golf club, asking his victim if he liked choking on his own blood, and then ran over him with a vehicle at least five times); *State v. Wood,* 132 Idaho 88, 967 P.2d 702 (1998) (the defendant kept his victim captive for over a day, during which time he sexually molested her and then shot her in the head with a rifle); *State v. Porter,* 130 Idaho 772, 948 P.2d 127 (1997) (holding that there was sufficient evidence to show that the victim suffered before she died based on numerous bruises on her forearms that appeared to be defensive wounds and the large amount of blood found at the scene of the crime indicating that many of the wounds were inflicted before the victim died); *State v. Wells,* 124 Idaho 836, 864 P.2d 1123 (1993) (one victim was struck repeatedly in the head with blows severe enough to shatter his skull, and the other victim was struck from behind with enough force to put a two-inch hole in her skull; both victims were barely alive when the police arrived); *State v. Hoffman,* 123 Idaho 638, 851 P.2d 934 (1993) (the victim spent an entire night knowing she was going to die and then had to beg the co-defendant to finish the job after the defendant had slashed her throat and left her to bleed to death); *State v. Sivak,* 119 Idaho 320, 806 P.2d 413 (1990) (the defendant stabbed his victim several times, shot her several times, and sexually molested her before she died); *State v. Leavitt,* 116 Idaho 285, 775 P.2d 599 (1989) (the victim suffered 15 slash and stab wounds and her sexual organs had been removed); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989) (the defendant shot his ex-wife repeatedly, but she could have been saved had she received medical attention); *State v. Beam,* 115 Idaho 208, 766 P.2d 678 (1988) (the thirteen-year-old victim was raped, her throat slit, and she ultimately was drowned); *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985) (the defendant bound his victim's hands and mouth with duct tape, and the victim was nearly asphyxiated when the defendant killed him by stabbing him repeatedly); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985) (the defendant was convicted of murder by torture of a three-year-old child); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983)(the co-defendants beat one victim with a baseball bat and then knocked out their other victim and strangled her).

The unconstitutionality of the HAC factor should not be considered harmless error. The trial court found four other aggravating factors that individually outweighed the mitigating factors. However, when the trial court weighed these factors it did not consider various mitigating circumstances that Pizzuto has effectively argued should have been considered. Specifically, the ineffectiveness of Pizzuto's counsel during sentencing and the trial judge's improper use of mitigating circumstances as aggravating (discussed below) skewed the balancing process. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir.2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted."). Because the body of mitigating evidence actually considered by the trial court is unreliable, a reweighing is required, and the unconstitutional HAC factor should be eliminated to ensure that it does not comprise any part of the balance.

## IV.

### Non-statutory Aggravating Factors

In its sentencing findings, the trial court listed as an aggravating circumstance that Pizzuto "is unintelligent, uneducated, unskilled and totally lacking in discipline and motivation such that he will never be capable of securing or maintaining employment or of being anything other than a counter productive element of society." The trial court's use of these factors as aggravating is invalid and offends the Eighth Amendment. We held in *Beam v. Paskett* that:

> Under the Eighth Amendment, a state may not make application of the death penalty depend upon a particular characteristic of the offense or offender if selection of such a characteristic "makes no measurable contribution to acceptable goals of punishment. . . ." Thus, before a state may base its decision to

execute a defendant on a defendant's particular characteristics, the state must demonstrate that its reliance on such characteristics serves to further its interest in retribution, in deterrence, or in the elimination of those likely to kill again.

3 F.3d 1301, 1308 (9th Cir.1993) (citations omitted). We held that it was improper to use Beam's non-violent, consensual or involuntary sexual conduct to find that he would be a continuing threat to society. In order to be constitutionally permissible, *Beam* held that the state must "introduce evidence demonstrating a close link between the defendant's sexual history and his future dangerousness." *Id.* at 1309. The court concluded that the state failed to demonstrate this close link. *Id.*

The State suggests that there is a link between Pizzuto's lack of intelligence, education, skills, discipline and motivation and the legitimate penological goal of rehabilitation. However, the State presented no evidence establishing a "close link" between the defendant's characteristics and his ability to be rehabilitated. It is true that these qualities might hinder his ability to gain employment, but the fact that he may end up unemployed does not necessarily mean that he will continue a life of crime, particularly since incarceration is inevitable if he is not executed. Any possible link here is extremely tenuous. The state has failed to show that selecting Pizzuto's low I.Q. and lack of education and skills as reasons to put him to death makes any measurable contribution to acceptable goals of punishment. The trial court violated the Eighth Amendment by relying on these characteristics as aggravating circumstances.

This Eighth Amendment violation is not harmless error because the evidence of Pizzuto's low I.Q. not only should not have been considered aggravating, but it should

have been considered mitigating.[15] According to the expert testimony of Dr. Emery, Pizzuto's I.Q. of 72 indicates that he is borderline mentally retarded. Courts have frequently held that borderline mental retardation is an important mitigating factor. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Pizzuto was entitled to the opportunity to have this factor be considered mitigating. *See Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that the trier of fact must be allowed to consider and give effect to all relevant mitigating evidence). This opportunity was foreclosed when the trial judge improperly twisted this factor into an aggravating circumstance. The trial judge's treatment of this mitigating evidence was worse than an exclusion, which would have been forbidden.

Because this error affected both sides of the balance, one cannot be sure that the valid aggravating factors would have outweighed all the mitigating evidence, including that which was previously not considered.[16] Based on this violation and the unconstitutionality of the HAC factor, we should vacate the death sentence and remand for resentencing.

## V.

### Conclusion

Pizzuto's Fifth, Sixth, and Eighth Amendment rights were violated at his capital sentencing, resulting in a punishment of death. Pizzuto's death sentence should be vacated and the case remanded for resentencing because the trial court relied on Idaho's unconstitutional HAC aggravating factor and on unconstitutional, non-statutory aggravating factors that should have been considered mitigating. Even in the absence of these errors, at a minimum, this case should be remanded to the district court for an evidentiary hearing on Pizzuto's ineffective assistance claims and the violation of his Fifth and Sixth Amendment rights in the use of his uncounselled, non–Mirandized statements made in presentence interviews. I cannot agree that the numerous errors committed at Pizzuto's sentencing were non-prejudicial. I dissent.

---

**15.** Currently before the Idaho state court is Pizzuto's petition for habeas relief based on his claim that under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), his mental retardation precludes imposition of the death penalty and execution. Pizzuto's IQ is 72. *Atkins* notes that an "IQ between 70 and 75 or lower ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309 n. 5, 122 S.Ct. 2242. The Court held that execution of such persons "is excessive" under the Eighth Amendment "and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* at 321, 122 S.Ct. 2242 (citation omitted). I would stay further proceedings pending the outcome of ongoing state proceedings. The

majority has denied a stay and declines even to require the parties to advise us of the status of the state proceedings.

**16.** Even were we to conclude that the trial judge was not required to consider Pizzuto's borderline mental retardation as mitigating, the constitutional violation inherent in considering it aggravating still would not be harmless. As discussed with regard to the HAC factor above, when the trial court concluded that other aggravating factors individually outweighed the mitigating factors, it did not consider the mitigating circumstances that Pizzuto's ineffective counsel failed to present to the court at sentencing. Under these circumstances, any conclusion on harmlessness should await the evidentiary hearing on Pizzuto's ineffectiveness claims.